(Slip Opinion)          OCTOBER TERM, 2009          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## RENICO, WARDEN *v.* LETT

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 09–338.   Argued March 29, 2010—Decided May 3, 2010

From jury selection to jury instructions in a Michigan court, respondent Lett's first trial for, *inter alia,* first-degree murder took less than nine hours.  During approximately four hours of deliberations, the jury sent the trial court seven notes, including one asking what would happen if the jury could not agree.  The judge called the jury and the attorneys into the courtroom and questioned the foreperson, who said that the jury was unable to reach a unanimous verdict.  The judge then declared a mistrial, dismissed the jury, and scheduled a new trial.  At Lett's second trial, after deliberating for only 3 hours and 15 minutes, a new jury found him guilty of second-degree murder.  On appeal, Lett argued that because the judge in his first trial had announced a mistrial without any manifest necessity to do so, the Double Jeopardy Clause barred the State from trying him a second time.  Agreeing, the Michigan Court of Appeals reversed the conviction. The Michigan Supreme Court reversed.  It concluded that, under *United States* v. *Perez*, 9 Wheat. 579, 580, a defendant may be retried following the discharge of a deadlocked jury so long as the trial court exercised its "sound discretion" in concluding that the jury was deadlocked and thus that there was a "manifest necessity" for a mistrial; and that, under *Arizona* v. *Washington*, 434 U. S. 497, 506–510, an appellate court must generally defer to a trial judge's determination that a deadlock has been reached.  It then found that the judge at Lett's first trial had not abused her discretion in declaring the mistrial, observing that the jury had deliberated a sufficient amount of time following a short, noncomplex trial; that the jury had sent several notes, including one appearing to indicate heated discussions; and that the foreperson had stated that the jury could not reach a verdict.  In Lett's federal habeas petition, he contended that the

Michigan Supreme Court's rejection of his double jeopardy claim was "an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States," 28 U. S. C. §2254(d)(1), and thus that he was not barred by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) from obtaining federal habeas relief. The District Court granted the writ, and the Sixth Circuit affirmed.

*Held:* Because the Michigan Supreme Court's decision in this case was not unreasonable under AEDPA, the Sixth Circuit erred in granting Lett habeas relief. Pp. 5–12.

(a) The question under AEDPA is whether the Michigan Supreme Court's determination was "an unreasonable application of . . . clearly established Federal law," §2254(d)(1), not whether it was an incorrect application of that law, see *Williams* v. *Taylor*, 529 U. S. 362, 410. AEDPA imposes a "highly deferential standard for evaluating state-court rulings," *Lindh* v. *Murphy*, 521 U. S. 320, 333, n. 7, and "demands that [they] be given the benefit of the doubt," *Woodford* v. *Visciotti*, 537 U. S. 19, 24 (*per curiam*). Pp. 5–6.

(b) Here, the "clearly established Federal law" is largely undisputed. When a judge discharges a jury on the grounds that the jury cannot reach a verdict, the Double Jeopardy Clause does not bar a new trial for the defendant before a new jury, *Perez*, 9 Wheat., at 579–580. Trial judges may declare a mistrial when, "in their opinion, taking all the circumstances into consideration, there is a manifest necessity" for doing so, *id.*, at 580, *i.e.,* a "high degree" of necessity, *Washington*, *supra,* at 506. The decision whether to grant a mistrial is reserved to the "broad discretion" of the trial judge, *Illinois* v. *Somerville*, 410 U. S. 458, 462, and the discretion "to declare a mistrial [for a deadlocked jury] is . . . accorded great deference by a reviewing court," *Washington*, *supra*, at 510, although this deference is not absolute. This Court has expressly declined to require the "mechanical application" of any "rigid formula," *Wade* v. *Hunter*, 336 U. S. 684, 690–691, when a trial judge decides to declare a mistrial due to jury deadlock, and it has explicitly held that the judge is not required to make explicit findings of "manifest necessity" or "articulate on the record all the factors" informing his discretion, *Washington*, *supra*, at 517. The Court has never required a judge in these circumstances to force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the impasse. Moreover, the legal standard applied by the Michigan Supreme Court is a general one—whether there was an abuse of the "broad discretion" reserved to the trial judge, *Somerville*, *supra*, at 462. Because AEDPA authorizes a federal court to grant

relief only when a state court's application of federal law was unreasonable, it follows that "[t]he more general the rule" at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—"the more leeway [state] courts have in reaching outcomes in case-by-case determinations." *Yarborough* v. *Alvarado*, 541 U. S. 652, 664. Pp. 6–9.

(c) The Michigan Supreme Court's adjudication involved a straightforward application of this Court's longstanding precedents to the facts of Lett's case. The state court cited this Court's double jeopardy cases—from *Perez* to *Washington*—applying those precedents to the particular facts before it and finding no abuse of discretion in light of the length of deliberations following a short, uncomplicated trial, the jury's notes to the judge, and the fact that the foreperson stated that the jury could not reach a verdict. It was thus reasonable for the court to determine that the trial judge had exercised sound discretion in declaring a mistrial. The Sixth Circuit concluded otherwise because it disagreed with the inferences that the Michigan Supreme Court had drawn from the facts. The Circuit Court's interpretation is not implausible, but other reasonable interpretations of the record are also possible. It was not objectively unreasonable for the Michigan Supreme Court to conclude that the trial judge's exercise of discretion was sound, both in light of what happened at trial and the fact that the relevant legal standard is a general one, to which there is no "plainly correct or incorrect" answer in this case. *Yarborough*, *supra,* at 664. The Sixth Circuit failed to grant the Michigan courts the dual layers of deference required by AEDPA and this Court's double jeopardy precedents. Pp. 9–11.

(d) The Sixth Circuit also erred in relying on its own *Fulton* v. *Moore* decision for the proposition that *Arizona* v. *Washington* sets forth three specific factors that determine whether a judge has exercised sound discretion. Because *Fulton* does not constitute "clearly established Federal law, as determined by the Supreme Court," §2254(d)(1), failure to apply it does not independently authorize habeas relief under AEDPA. Nor can *Fulton* be understood merely to illuminate this Court's decision in *Washington*, as *Washington* did not set forth any such test to determine whether a trial judge has exercised sound discretion in declaring a mistrial. Pp. 11–12.

(e) The Court does not deny that the trial judge in this case could have been more thorough before declaring a mistrial. Nonetheless, the steps that the Sixth Circuit thought she should have taken were not required—either under this Court's double jeopardy precedents or, by extension, under AEDPA. Pp. 12.

316 Fed. Appx. 421, reversed and remanded.

Syllabus

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, GINSBURG, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion, in which SOTOMAYOR, J., joined, and in which BREYER, J., joined as to Parts I and II.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 09–338

PAUL RENICO, WARDEN, PETITIONER *v.*
REGINALD LETT

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[May 3, 2010]

CHIEF JUSTICE ROBERTS delivered the opinion of the
Court.

This case requires us to review the grant of a writ of
habeas corpus to a state prisoner under the Antiterrorism
and Effective Death Penalty Act of 1996 (AEDPA), 28
U. S. C. §2254(d). The District Court in this case issued
the writ to respondent Reginald Lett on the ground that
his Michigan murder conviction violated the Double Jeop-
ardy Clause of the Constitution, and the U. S. Court of
Appeals for the Sixth Circuit affirmed. In doing so, how-
ever, these courts misapplied AEDPA's deferential stan-
dard of review. Because we conclude that the Michigan
Supreme Court's application of federal law was not unrea-
sonable, we reverse.

I

On August 29, 1996, an argument broke out in a Detroit
liquor store. The antagonists included Adesoji Latona, a
taxi driver; Charles Jones, a passenger who claimed he
had been wrongfully ejected from Latona's cab; and
Reginald Lett, a friend of Jones's. After the argument
began, Lett left the liquor store, retrieved a handgun from

another friend outside in the parking lot, and returned to the store. He shot Latona twice, once in the head and once in the chest. Latona died from his wounds shortly thereafter. See *People* v. *Lett*, 466 Mich. 206, 208–209, 644 N. W. 2d 743, 745 (2002).

Michigan prosecutors charged Lett with first-degree murder and possession of a firearm during the commission of a felony. His trial took place in June 1997. From jury selection to jury instructions the trial took less than nine hours, spread over six different days. *Id.,* at 209, 644 N. W. 2d, at 745.

The jury's deliberations began on June 12, 1997, at 3:24 p.m., and ran that day until 4 p.m. *Id.*, at 209, n. 1, 644 N. W. 2d, at 745, n. 1. After resuming its work the next morning, the jury sent the trial court a note—one of seven it sent out in its two days of deliberations—stating that the jurors had "'a concern about our voice levels disturbing any other proceedings that might be going on.'" *Id.*, at 209, n. 2, 644 N. W. 2d, at 745, n. 2. Later, the jury sent out another note, asking "'What if we can't agree? [M]istrial? [R]etrial? [W]hat?'" *Id.*, at 209, 644 N. W. 2d, at 745.

The trial transcript does not reveal whether the judge discussed the jury's query with counsel, off the record, upon receiving this last communication. *Id.*, at 209, n. 3, 644 N. W. 2d, at 745, n. 3. What is clear is that at 12:45 p.m. the judge called the jury back into the courtroom, along with the prosecutor and defense counsel. Once the jury was seated, the following exchange took place:

> "THE COURT: I received your note asking me what if you can't agree? And I have to conclude from that that that is your situation at this time. So, I'd like to ask the foreperson to identify themselves, please?
> "THE FOREPERSON: [Identified herself.]
> "THE COURT: Okay, thank you. All right. I need

to ask you if the jury is deadlocked; in other words, is there a disagreement as to the verdict?

"THE FOREPERSON: Yes, there is.

"THE COURT: All right. Do you believe that it is hopelessly deadlocked?

"THE FOREPERSON: The majority of us don't believe that—

"THE COURT: (Interposing) Don't say what you're going to say, okay?

"THE FOREPERSON: Oh, I'm sorry.

"THE COURT: I don't want to know what your verdict might be, or how the split is, or any of that. Thank you. Okay? Are you going to reach a unanimous verdict, or not?

"THE FOREPERSON: (No response)

"THE COURT: Yes or no?

"THE FOREPERSON: No, Judge." Tr. in No. 96–08252 (Recorder's Court, Detroit, Mich.), pp. 319–320.

The judge then declared a mistrial, dismissed the jury, and scheduled a new trial for later that year. Neither the prosecutor nor Lett's attorney made any objection.

Lett's second trial was held before a different judge and jury in November 1997. This time, the jury was able to reach a unanimous verdict—that Lett was guilty of second-degree murder—after deliberating for only 3 hours and 15 minutes. *Lett*, *supra*, at 210, and n. 4, 644 N. W. 2d, at 746, and n. 4.

Lett appealed his conviction to the Michigan Court of Appeals. He argued that the judge in his first trial had announced a mistrial without any manifest necessity for doing so. Because the mistrial was an error, Lett maintained, the State was barred by the Double Jeopardy Clause of the U. S. Constitution from trying him a second time. The Michigan Court of Appeals agreed with Lett and reversed his conviction.

The State appealed to the Michigan Supreme Court, which reversed the Court of Appeals. The court explained that under our decision in *United States* v. *Perez*, 9 Wheat. 579 (1824), a defendant may be retried following the discharge of a deadlocked jury, even if the discharge occurs without the defendant's consent. *Lett*, 466 Mich., at 216–217, 644 N. W. 2d, at 749. There is no Double Jeopardy Clause violation in such circumstances, it noted, so long as the trial court exercised its "'sound discretion'" in concluding that the jury was deadlocked and thus that there was a "'manifest necessity'" for a mistrial. *Ibid.* (quoting *Perez*, *supra*, at 580; emphasis deleted). The court further observed that, under our decision in *Arizona* v. *Washington*, 434 U. S. 497, 506–510 (1978), an appellate court must generally defer to a trial judge's determination that a deadlock has been reached. 466 Mich., at 218–222, 644 N. W. 2d, at 750–752.

After setting forth the applicable law, the Michigan Supreme Court determined that the judge at Lett's first trial had not abused her discretion in declaring the mistrial. *Id.*, at 223, 644 N. W. 2d, at 753. The court cited the facts that the jury "had deliberated for at least four hours following a relatively short, and far from complex, trial," that the jury had sent out several notes, "including one that appears to indicate that its discussions may have been particularly heated," and—"[m]ost important"—"that the jury foreperson expressly stated that the jury was not going to reach a verdict." *Ibid.*

Lett petitioned for a federal writ of habeas corpus. Again he argued that the trial court's declaration of a mistrial constituted an abuse of discretion because there was no manifest necessity to cut short the jury's deliberations. He further contended that the Michigan Supreme Court's rejection of his double jeopardy claim amounted to "an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the

United States," and thus that he was not barred by AEDPA, 28 U. S. C. §2254(d)(1), from obtaining federal habeas relief. The District Court agreed and granted the writ. 507 F. Supp. 2d 777 (ED Mich. 2007). On appeal, a divided panel of the U. S. Court of Appeals for the Sixth Circuit affirmed. 316 Fed. Appx. 421 (2009). The State petitioned for review in our Court, and we granted certiorari. 558 U. S. \_\_\_ (2009).

## II

It is important at the outset to define the question before us. That question is not whether the trial judge should have declared a mistrial. It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law." §2254(d)(1).

We have explained that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams* v. *Taylor*, 529 U. S. 362, 410 (2000). Indeed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.*, at 411. Rather, that application must be "objectively unreasonable." *Id.*, at 409. This distinction creates "a substantially higher threshold" for obtaining relief than *de novo* review. *Schriro* v. *Landrigan*, 550 U. S. 465, 473 (2007). AEDPA thus imposes a "highly deferential standard for evaluating state-court rulings," *Lindh* v. *Murphy*, 521 U. S. 320, 333, n. 7 (1997), and "demands that state-court decisions be given the benefit of the doubt," *Woodford* v. *Visciotti*, 537 U. S. 19, 24 (2002)

(*per curiam*).[1]

The "clearly established Federal law" in this area is largely undisputed. In *Perez*, we held that when a judge discharges a jury on the grounds that the jury cannot reach a verdict, the Double Jeopardy Clause does not bar a new trial for the defendant before a new jury. 9 Wheat., at 579–580. We explained that trial judges may declare a mistrial "whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity" for doing so. *Id.*, at 580. The decision to declare a mistrial is left to the "sound discretion" of the judge, but "the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Ibid.*

Since *Perez*, we have clarified that the "manifest necessity" standard "cannot be interpreted literally," and that a mistrial is appropriate when there is a "'high degree'" of necessity. *Washington*, *supra*, at 506. The decision whether to grant a mistrial is reserved to the "broad discretion" of the trial judge, a point that "has been consistently reiterated in decisions of this Court." *Illinois* v. *Somerville*, 410 U. S. 458, 462 (1973). See also *Gori* v. *United States*, 367 U. S. 364, 368 (1961).

In particular, "[t]he trial judge's decision to declare a mistrial when he considers the jury deadlocked is . . . accorded great deference by a reviewing court." *Washing-*

—————

[1] The dissent correctly points out that AEDPA itself "never uses the term 'deference.'" *Post*, at 19 (opinion of STEVENS, J.). But our cases have done so over and over again to describe the effect of the threshold restrictions in 28 U. S. C. §2254(d) on granting federal habeas relief to state prisoners. See, *e.g.*, *Wellons* v. *Hall*, 558 U. S. ___, ___, n. 3 (2010) (*per curiam*) (slip op., at 5, n. 3); *Smith* v. *Spisak*, 558 U. S. ___, ___ (2010) (slip op., at 2); *McDaniel* v. *Brown*, 558 U. S. ___, ___ (2010) (*per curiam*) (slip op., at 13); *Cone* v. *Bell*, 556 U. S. ___, ___, (2009) (slip op., at 13, 23); *Knowles* v. *Mirzayance*, 556 U. S. ___, ___ n. 2 (2009) (slip op., at 9, n. 2); *Waddington* v. *Sarausad*, 555 U. S. ___, ___ (2009) (slip op., at 14).

*ton*, 434 U. S., at 510. A "mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict [has been] long considered the classic basis for a proper mistrial." *Id.*, at 509; see also *Downum* v. *United States*, 372 U. S. 734, 736 (1963) (deadlocked jury is the "classic example" of when the State may try the same defendant twice).

The reasons for "allowing the trial judge to exercise broad discretion" are "especially compelling" in cases involving a potentially deadlocked jury. *Washington*, 434 U. S., at 509. There, the justification for deference is that "the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate." *Id.*, at 510, n. 28. In the absence of such deference, trial judges might otherwise "employ coercive means to break the apparent deadlock," thereby creating a "significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors." *Id.*, at 510, 509.

This is not to say that we grant *absolute* deference to trial judges in this context. *Perez* itself noted that the judge's exercise of discretion must be "sound," 9 Wheat., at 580, and we have made clear that "[i]f the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to him, the reason for such deference by an appellate court disappears." *Washington*, 434 U. S., at 510, n. 28. Thus "if the trial judge acts for reasons completely unrelated to the trial problem which purports to be the basis for the mistrial ruling, close appellate scrutiny is appropriate." *Ibid.* Similarly, "if a trial judge acts irrationally or irresponsibly, . . . his action cannot be condoned." *Id.*, at 514 (citing *United States* v. *Jorn*, 400 U. S. 470 (1971), and *Somerville*, *supra*, at 469).

We have expressly declined to require the "mechanical

application" of any "rigid formula" when trial judges decide whether jury deadlock warrants a mistrial. *Wade* v. *Hunter*, 336 U. S. 684, 691, 690 (1949). We have also explicitly held that a trial judge declaring a mistrial is not required to make explicit findings of "'manifest necessity'" nor to "articulate on the record all the factors which informed the deliberate exercise of his discretion." *Washington*, *supra*, at 517. And we have never required a trial judge, before declaring a mistrial based on jury deadlock, to force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with (or obtain the consent of) either the prosecutor or defense counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the impasse. In 1981, then-Justice Rehnquist noted that this Court had never "overturned a trial court's declaration of a mistrial after a jury was unable to reach a verdict on the ground that the 'manifest necessity' standard had not been met." *Winston* v. *Moore*, 452 U. S. 944, 947 (opinion dissenting from denial of certiorari). The same remains true today, nearly 30 years later.

The legal standard applied by the Michigan Supreme Court in this case was whether there was an abuse of the "broad discretion" reserved to the trial judge. *Somerville*, *supra*, at 462; *Washington*, *supra*, at 509. This type of general standard triggers another consideration under AEDPA. When assessing whether a state court's application of federal law is unreasonable, "the range of reasonable judgment can depend in part on the nature of the relevant rule" that the state court must apply. *Yarborough* v. *Alvarado*, 541 U. S. 652, 664 (2004). Because AEDPA authorizes federal courts to grant relief only when state courts act *unreasonably*, it follows that "[t]he more general the rule" at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—"the more leeway [state] courts have in reaching

outcomes in case-by-case determinations." *Ibid.*; see also *Knowles* v. *Mirzayance*, 556 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 11).

## III

In light of all the foregoing, the Michigan Supreme Court's decision in this case was not unreasonable under AEDPA, and the decision of the Court of Appeals to grant Lett a writ of habeas corpus must be reversed.

The Michigan Supreme Court's adjudication involved a straightforward application of our longstanding precedents to the facts of Lett's case. The court cited our own double jeopardy cases—from *Perez* to *Washington*—elaborating upon the "manifest necessity" standard for granting a mistrial and noting the broad deference that appellate courts must give trial judges in deciding whether that standard has been met in any given case. *Lett*, 466 Mich., at 216–222, 644 N. W. 2d, at 749–752. It then applied those precedents to the particular facts before it and found no abuse of discretion, especially in light of the length of deliberations after a short and uncomplicated trial, the jury notes suggesting heated discussions and asking what would happen "if we can't agree," and— "[m]ost important"—"the fact that the jury foreperson expressly stated that the jury was not going to reach a verdict." *Id.*, at 223, 644 N. W. 2d, at 753. In these circumstances, it was reasonable for the Michigan Supreme Court to determine that the trial judge had exercised sound discretion in declaring a mistrial.

The Court of Appeals for the Sixth Circuit concluded otherwise. It did not contest the Michigan Supreme Court's description of the objective facts, but disagreed with the inferences to be drawn from them. For example, it speculated that the trial judge may have misinterpreted the jury's notes as signs of discord and deadlock when, read literally, they expressly stated no such thing. 316

Fed. Appx., at 427.  It further determined that the judge's brief colloquy with the foreperson may have wrongly implied a false equivalence between "mere disagreement" and "genuine deadlock," and may have given rise to "inappropriate pressure" on her to say that the jury would be unable to reach a verdict.  *Id.*, at 426–427.  The trial judge's mistakes were so egregious, in the Court of Appeals' view, that the Michigan Supreme Court's opinion finding no abuse of discretion was not only wrong but objectively unreasonable. *Id.*, at 427.

The Court of Appeals' interpretation of the trial record is not implausible.  Nor, for that matter, is the more inventive (surely not "crude") speculation of the dissent. *Post*, at 10.  After all, the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached.[2]

But other reasonable interpretations of the record are also possible.  Lett's trial was not complex, and there is no reason that the jury would necessarily have needed more than a few hours to deliberate over his guilt.  The notes the jury sent to the judge certainly could be read as reflecting substantial disagreement, even if they did not say so outright.  Most important, the foreperson expressly told the judge—in response to her unambiguous question "Are you going to reach a unanimous verdict, or not?"—that the jury would be unable to agree.  *Lett*, *supra*, at 210, 644 N. W. 2d, at 745.

Given the foregoing facts, the Michigan Supreme

_____

[2]We do not think it reasonable, however, to contend that "the foreperson had no solid basis for estimating the likelihood of deadlock." *Post*, at 12.  She had, after all, participated in the jury's deliberations.

Court's decision upholding the trial judge's exercise of discretion—while not necessarily correct—was not objectively unreasonable.[3]  Not only are there a number of plausible ways to interpret the record of Lett's trial, but the standard applied by the Michigan Supreme Court— whether the judge exercised sound discretion—is a general one, to which there is no "plainly correct or incorrect" answer in this case.  *Yarborough*, 541 U. S., at 664; see also *Knowles*, *supra*, at ___ (slip op., at 11).  The Court of Appeals' ruling in Lett's favor failed to grant the Michigan courts the dual layers of deference required by AEDPA and our double jeopardy precedents.

The Court of Appeals also erred in a second respect.  It relied upon its own decision in *Fulton* v. *Moore*, 520 F. 3d 522 (CA6 2008), for the proposition "that *Arizona v. Washington* sets forth three factors that determine whether a judge has exercised sound discretion in declaring a mistrial: whether the judge (1) heard the opinions of the parties' counsel about the propriety of the mistrial; (2) considered the alternatives to a mistrial; and (3) acted deliberately, instead of abruptly."  316 Fed. Appx., at 426.  It then cited *Fulton*'s interpretation of *Washington* to buttress its conclusion that the Michigan Supreme Court erred in concluding that the trial judge had exercised sound discretion.  316 Fed. Appx., at 428.

The *Fulton* decision, however, does not constitute "clearly established Federal law, as determined by the

——————

[3] It is not necessary for us to decide whether the Michigan Supreme Court's decision—or, for that matter, the trial judge's declaration of a mistrial—was right or wrong.  The latter question, in particular, is a close one.  As Lett points out, at a hearing before the Michigan Court of Appeals, the state prosecutor expressed the view that the judge had in fact erred in dismissing the jury and declaring a mistrial.  The Michigan Supreme Court declined to accept this confession of error, *People* v. *Lett*, 463 Mich. 939, 620 N. W. 2d 855 (2000), and in any event—for the reasons we have explained—whether the trial judge was right or wrong is not the pertinent question under AEDPA.

Supreme Court," §2254(d)(1), so any failure to apply that decision cannot independently authorize habeas relief under AEDPA. Nor, as the dissent suggests, can *Fulton* be understood merely to "illuminat[e]" *Washington. Post*, at 18. *Washington* nowhere established these three factors as a constitutional test that "determine[s]" whether a trial judge has exercised sound discretion in declaring a mistrial. 316 Fed. Appx., at 426.

In concluding that Lett is not entitled to a writ of habeas corpus, we do not deny that the trial judge could have been more thorough before declaring a mistrial. As the Court of Appeals pointed out, *id.*, at 427–428, she could have asked the foreperson additional followup questions, granted additional time for further deliberations, or consulted with the prosecutor and defense counsel before acting. Any of these steps would have been appropriate under the circumstances. None, however, was required—either under our double jeopardy precedents or, by extension, under AEDPA.

*        *        *

AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts. Whether or not the Michigan Supreme Court's opinion reinstating Lett's conviction in this case was *correct*, it was clearly *not unreasonable*. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 09–338

PAUL RENICO, WARDEN, PETITIONER *v.*
REGINALD LETT

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[May 3, 2010]

JUSTICE STEVENS, with whom JUSTICE SOTOMAYOR joins, and with whom JUSTICE BREYER joins as to Parts I and II, dissenting.

At common law, courts went to great lengths to ensure the jury reached a verdict. Fourteenth-century English judges reportedly loaded hung juries into oxcarts and carried them from town to town until a judgment "'bounced out.'"[1] Less enterprising colleagues kept jurors as *de facto* "prisoners" until they achieved unanimity.[2] The notion of a mistrial based on jury deadlock did not appear in Blackstone's Commentaries;[3] it is no surprise, then, that colonial juries virtually always returned a verdict.[4] Well into the 19th and even the 20th century,

---

[1] Comment, Deadlocked Juries and Dynamite: A Critical Look at the "Allen Charge," 31 U. Chi. L. Rev. 386 (1964) (citing G. Crabb, A History of English Law 287 (1829)); see *King* v. *Ledgingham*, 1 Vent. 97, 86 Eng. Rep. 67 (K. B. 1670); 2 M. Hale, Pleas of the Crown 297 (1736).

[2] J. Baker, An Introduction to English Legal History 75 (4th ed. 2002); see also 1 W. Holdsworth, A History of English Law 318–319 (rev. 7th ed. 1956).

[3] "When the evidence on both sides is closed," Blackstone observed of criminal cases, "the jury cannot be discharged till they have given in their verdict." 4 Commentaries on the Laws of England 354 (1769).

[4] See Thomas & Greenbaum, Justice Story Cuts the Gordian Knot of Hung Jury Instructions, 15 Wm. & Mary Bill Rights J. 893, 897 (2007).

some American judges continued to coax unresolved juries toward consensus by threatening to deprive them of heat,[5] sleep,[6] or sustenance[7] or to lock them in a room for a prolonged period of time.[8]

Mercifully, our legal system has evolved, and such harsh measures are no longer tolerated. Yet what this history demonstrates—and what has not changed—is the respect owed "a defendant's valued right to have his trial completed by a particular tribunal." *Wade* v. *Hunter*, 336 U. S. 684, 689 (1949). Our longstanding doctrine applying the Double Jeopardy Clause attests to the durability and fundamentality of this interest.

"The reasons why this 'valued right' merits constitutional protection are worthy of repetition." *Arizona* v. *Washington*, 434 U. S. 497, 503 (1978).

> "Even if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed. Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial." *Id.,* at 503–505 (footnotes omitted).

---

According to these scholars, "[t]he first report of a mistrial for failure to reach a verdict in an American court was 1807." *Ibid.*

[5] See, *e.g., Mead* v. *Richland Center*, 237 Wis. 537, 540–541, 297 N. W. 419, 421 (1941).

[6] See, *e.g., Commonwealth* v. *Moore*, 398 Pa. 198, 204–205, 157 A. 2d 65, 69 (1959).

[7] See, *e.g., Cole* v. *Swan*, 4 Greene 32, 33 (Iowa 1853).

[8] See, *e.g., Canterberry* v. *Commonwealth*, 222 Ky. 510, 513–514, 1 S. W. 2d 976, 977 (1928).

"The underlying idea . . . is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Green* v. *United States*, 355 U. S. 184, 187–188 (1957).[9]

We have come over the years to recognize that jury coercion poses a serious threat to jurors and defendants alike, and that the accused's interest in a single proceeding must sometimes yield "to the public's interest in fair trials designed to end in just judgments," *Wade*, 336 U. S., at 689; and we have therefore carved out exceptions to the common-law rule. But the exceptions are narrow. For a mistrial to be granted at the prosecutor's request, "the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar. His burden is a heavy one." *Washington*, 434 U. S., at 505. A judge who acts *sua sponte* in declaring a mistrial must similarly make sure, and must enable a reviewing court to confirm, that there is a "'manifest necessity'" to deprive the defendant of his valued right. *Ibid.*

In this case, the trial judge did not meet that burden. The record suggests that she discharged the jury without considering any less extreme courses of action, and the record makes quite clear that she did not fully appreciate the scope or significance of the ancient right at stake. The Michigan Supreme Court's decision rejecting Reginald Lett's double jeopardy claim was just as clearly in error.

---

[9] As Justice Harlan observed, "[a] power in government to subject the individual to repeated prosecutions for the same offense would cut deeply into the framework of procedural protections which the Constitution establishes for the conduct of a criminal trial." *United States* v. *Jorn*, 400 U. S. 470, 479 (1971) (plurality opinion).

I

No one disputes that a "genuinely deadlocked jury" is "the classic basis" for declaring a mistrial or that such declaration, under our doctrine, does not preclude reprosecution, *id.,* at 509; what is disputed in this case is whether the trial judge took adequate care to ensure the jury was genuinely deadlocked. A long line of precedents from this Court establishes the "governing legal principle[s]," *Williams* v. *Taylor*, 529 U. S. 362, 413 (2000), for resolving this question. Although the Court acknowledges these precedents, *ante*, at 6–8, it minimizes the heavy burden we have placed on trial courts.

"The fountainhead decision . . . is *United States* v. *Perez*, 9 Wheat. 579 (1824)." *Illinois* v. *Somerville*, 410 U. S. 458, 461 (1973).[10] Writing for a unanimous Court, Justice Story articulated a "manifest necessity" standard that continues to govern the double jeopardy analysis for mistrial orders:

> "We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right to order the dis-

––––––––

[10] See also *Gori* v. *United States*, 367 U. S. 364, 368 (1961) (*Perez* is "authoritative starting point of our law in this field").

charge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office." *United States* v. *Perez*, 9 Wheat. 579, 580 (1824).

This passage, too, is worthy of repetition, because in it the *Perez* Court struck a careful balance. The Court established the authority of trial judges to discharge the jury prior to verdict, but in recognition of the novelty and potential injustice of the practice, the Court subjected that authority to several constraints: The judge may not declare a mistrial unless "there is a manifest necessity for the act" or "the ends of public justice" so require; and in determining whether such conditions exist, the judge must exercise "sound discretion," "conscientious[ness]," and "the greatest caution," reserving the discharge power for "urgent circumstances" and "very plain and obvious causes." *Ibid.* What exact circumstances and causes would meet that bar, the Court declined to specify. Recognizing that trial proceedings may raise innumerable complications, so that "it is impossible to define" in advance all of the possible grounds for "interfere[nce]," the Court set forth general standards for judicial conduct rather than categorical rules for specific classes of situations. *Ibid.*

The seeds of our entire jurisprudence on the permissibility of retrial following an initial mistrial are packed into this one passage. Later Courts have fleshed out *Perez*, without making significant innovations or additions. Justice Story's formulation has been "quoted over and over again to provide guidance in the decision of a wide variety of cases," *Washington*, 434 U. S., at 506, and it has been "consistently adhered to by this Court in subsequent decisions," *Somerville*, 410 U. S., at 462.

Thus, we have repeatedly reaffirmed that the power to discharge the jury prior to verdict should be reserved for

"extraordinary and striking circumstances," *Downum* v. *United States*, 372 U. S. 734, 736 (1963) (internal quotation marks omitted); that the trial judge may not take this "weighty" step, *Somerville*, 410 U. S., at 471, unless and until he has "scrupulous[ly]" assessed the situation and "take[n] care to assure himself that [it] warrants action on his part foreclosing the defendant from a potentially favorable judgment by the tribunal," *United States* v. *Jorn*, 400 U. S. 470, 485, 486 (1971) (plurality opinion);[11] that, to exercise sound discretion, the judge may not act "irrationally," "irresponsibly," or "precipitately" but must instead act "deliberately" and "careful[ly]," *Washington*, 434 U. S., at 514–515, 516;[12] and that, in view of "the elusive nature of the problem," mechanical rules are no substitute in the double jeopardy mistrial context for the sensitive application of general standards, *Jorn*, 400 U. S., at 485 (plurality opinion).[13] The governing legal principles in this area are just that—principles—and their application to any particular set of facts entails an element of judgment.

As the Court emphasizes, we have also repeatedly reaf-

---

[11] See also *Jorn*, 400 U. S., at 486 ("[I]n the final analysis, the judge must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate"). *Jorn* was technically a plurality opinion, but in all relevant respects it was a majority product. Justices Black and Brennan believed the Court lacked jurisdiction over the appeal, and for that reason they withheld their full assent. *Id.,* at 488 (statement concurring in judgment). "However, in view of a decision by a majority of the Court to reach the merits, they join[ed] the judgment of the Court." *Ibid.* As petitioner acknowledges, *Jorn* broke no new ground: Its "holding is consistent [with] and no broader than *Perez*." Reply Brief for Petitioner 18, n. 50.

[12] See Brief for Petitioner 13–14, 25, 32 (recognizing this "constitutional floor").

[13] Accord, *Arizona* v. *Washington*, 434 U. S. 497, 506 (1978); *Illinois* v. *Somerville*, 410 U. S. 458, 462 (1973); *Downum* v. *United States*, 372 U. S. 734, 737 (1963); *Gori*, 367 U. S., at 369.

firmed that trial judges have considerable leeway in de-
termining whether the jury is deadlocked, that they are
not bound to use specific procedures or to make specific
findings, and that reviewing courts must accord broad
deference to their decisions. *Ante*, at 6–8. But the review-
ing court still has an important role to play; the applica-
tion of deference "does not, of course, end the inquiry."
*Washington*, 434 U. S., at 514. "In order to ensure that
[the defendant's constitutional] interest is adequately
protected, reviewing courts have an obligation to satisfy
themselves that, in the words of Mr. Justice Story, the
trial judge exercised 'sound discretion' in declaring a
mistrial." *Ibid.* "If the record reveals that the trial judge
has failed to exercise the 'sound discretion' entrusted to
him, the reason for . . . deference by an appellate court
disappears." *Id.,* at 510, n. 28. And while trial judges
need not follow any precise regimen to facilitate appellate
review, they must at least take care to ensure that "[t]he
basis for [a] mistrial order is adequately disclosed by the
record." *Id.,* at 517.

　Our precedents contain examples of judicial action on
both sides of the line. We have, for instance, allowed a
second trial when the jurors in the first trial, after 40
hours of deliberation, "announced in open court that they
were unable to agree," and no "specific and traversable
fact[s]" called their deadlock into question. *Logan* v.
*United States*, 144 U. S. 263, 298 (1892). We have like-
wise permitted reprosecution when the initial judge heard
"extended argument" from both parties on the mistrial
motion, acted with evident "concern for the possible double
jeopardy consequences of an erroneous ruling," and "ac-
corded careful consideration to [the defendant's] interest
in having the trial concluded in a single proceeding."
*Washington*, 434 U. S., at 501, 515, 516.

　On the other hand, we have barred retrial when the first
judge acted "abruptly," cutting off the prosecutor "in mid-

stream" and discharging the jury without giving the parties an opportunity to object. *Jorn*, 400 U. S., at 487 (plurality opinion); see also *Somerville*, 410 U. S., at 469 (characterizing *Jorn* judge's actions as "erratic"). And we have opined that, while trial judges have considerable leeway in deciding whether to discharge the jury, "[w]e resolve any doubt in favor of the liberty of the citizen, rather than exercise what would be an unlimited, uncertain, and arbitrary judicial discretion." *Downum*, 372 U. S., at 738 (internal quotation marks omitted).

## II

The Court accurately describes the events leading up to this trial judge's declaration of mistrial, *ante*, at 2–3, but it glides too quickly over a number of details that, taken together, show her decisionmaking was neither careful nor well considered. If the "manifest necessity" and "sound discretion" standards are to have any force, we must demand more from our trial courts.

It is probably fair to say that this trial was not especially complex, *ante*, at 4, 10, but neither was it a trivial affair. Lett was charged with the most serious of crimes, first-degree murder, as well as possession of a firearm during the commission of a felony. He faced a potential sentence of life imprisonment if convicted. Seventeen witnesses provided testimony over the course of 10 calendar days. See 507 F. Supp. 2d 777, 779, 785–786 (ED Mich. 2007); see also *id.,* at 785 (discussing "piecemeal fashion" in which evidence was presented to the jury).

The jury's first period of deliberation on Thursday afternoon lasted less than 40 minutes. "The jury likely spent" that brief session "doing little more than electing a foreperson." *People* v. *Lett*, 466 Mich. 206, 227, 644 N. W. 2d 743, 755 (2002) (Cavanagh, J., dissenting). The jury deliberated a few more hours on Friday morning prior to discharge. During that time, it sent the trial court seven

notes. Most were inconsequential, routine queries. The first note on Friday morning raised "'a concern about [the jurors'] voice levels,'" Letter from M. McCowan to Clerk of Court (Mar. 4, 2010), p. 2, but nothing in the record relates this concern to the substance or tenor of their discussion. At 12:27 p.m., the jury sent the fateful missive, asking: "'What if we can't agree? [M]istrial? [R]etrial? [W]hat?'" *Ibid.* Seconds later, still at 12:27 p.m., the jury sent another note: "'What about lunch?'" *Ibid.*

At 12:45 p.m., the trial judge initiated a colloquy with the foreperson that concluded in the mistrial declaration. See *ante*, at 2–3 (reproducing transcript of colloquy). Even accounting for the imprecision of oral communication, the judge made an inordinate number of logical and legal missteps during this short exchange. Cf. *Somerville*, 410 U. S., at 469 (critiquing "erratic" mistrial inquiry). It does not take much exegetical skill to spot them.

The judge began by stating: "'I received your note asking me what if you can't agree? And I have to conclude from that that that is your situation at this time.'" *Ante*, at 2. This "'conclu[sion]'" was a non sequitur. The note asked what would happen *if* the jury could not agree; it gave no indication that the jury had *already* reached an irrevocable impasse. The judge ignored the request for information that the note actually contained. Instead, she announced that deadlock was the jury's "'situation at this time,'" thereby prejudging the question she had ostensibly summoned the foreperson to probe: namely, whether the jury was in fact deadlocked.

The judge continued: "'I need to ask you if the jury is deadlocked; in other words, is there a disagreement as to the verdict?'" *Ante*, at 2–3. As the Federal Court of Appeals observed, this question "improperly conflated deadlock with mere disagreement." 316 Fed. Appx. 421, 426 (CA6 2009). Deadlock is a "condition or situation in which it is impossible to proceed or act; a complete standstill." 4

Oxford English Dictionary 290 (2d ed. 1989). Disagreement among jurors is perfectly normal and does not come close to approaching the "imperious necessity" we have required for their discharge. *Downum*, 372 U. S., at 736.

   The trial judge then modulated her inquiry: "'Do you believe [the jury] is hopelessly deadlocked?'" *Ante*, at 3. The foreperson was in the midst of replying, "'The majority of us don't believe that—,'" when the judge appears to have cut her off. *Ibid.* One cannot "fault the trial judge" for wanting "to preserve the secrecy of jury deliberations," 507 F. Supp. 2d, at 787, but two aspects of the foreperson's truncated reply are notable. First, it "tends to show that the foreperson did not feel prepared to declare definitively that the jury was hopelessly deadlocked." *Ibid.* If she had been so prepared, then it is hard to see why she would begin her response with a descriptive account of the "'majority'" viewpoint.

   Second, the foreperson's reply suggests the jury may have been leaning toward acquittal. Admittedly, this is crude speculation, but it is entirely possible that the foreperson was in the process of saying, "The majority of us don't believe that he's guilty." Or: "The majority of us don't believe that there is sufficient evidence to prove one of the counts." (On retrial, Lett was convicted on both counts.) These possibilities are, I submit, linguistically more probable than something like the following: "The majority of us don't believe that Lett is guilty, whereas a minority of us believe that he is—*and we are hopelessly deadlocked on the matter*." And they are logically far more probable than something along the lines of, "The majority of us don't believe that we will ever be able to reach a verdict," as the foreperson had been given no opportunity to poll her colleagues on this point. Yet only such implausible endings could have supported a conclusion that it

was manifestly necessary to discharge the jury.[14]

The judge then steered the conversation back to the issue of deadlock, asking: "'Are you going to reach a unanimous verdict, or not?'" *Ante*, at 3. After the foreperson hesitated, the judge persisted: "'Yes or no?'" *Ibid.* The foreperson replied: "'No, Judge.'" *Ibid.* Two aspects of this interchange are also notable. First, the judge's question, though "very direct," was "actually rather ambiguous," because it gave the foreperson no temporal or legal context within which to understand what was being asked. 507 F. Supp. 2d, at 787. "The foreperson could have easily thought the judge meant, 'Are you going to reach a unanimous verdict in the next hour?' or 'before the lunch recess?' or 'by the end of the day?'" *Ibid.* (emphasis deleted). Even if the foreperson assumed no time constraint, she could have easily thought the judge meant, "Are you, in your estimation, *more likely than not* to reach a unanimous verdict?" An affirmative answer to that question would likewise fall far short of manifest necessity.

Second, the foreperson's hesitation suggests a lack of confidence in her position. That alone ought to have called into question the propriety of a mistrial order. But the judge bore down and demanded an unqualified answer, "'Yes or no.'" Most of the time when we worry about judicial coercion of juries, we worry about judges pressuring them, in the common-law manner, to keep deliberating until they return a verdict they may not otherwise have

_____

[14]Another reading of the foreperson's reply is available: Her statement,"'The majority of us don't believe that,'" may have been a complete sentence. In other words, she may have meant to convey, "The majority of us don't believe that we are hopelessly deadlocked." The trial-court transcript places an em dash rather than a period after the word "that," but this is hardly dispositive evidence of intonation or intent. However, the trial judge's contemporaneous reaction, the fact that the foreperson was not permitted to consult with the other jurors on the issue of deadlock, and respondent's failure to advance this reading undercut its plausibility.

chosen. This judge exerted pressure so as to prevent the jury from reaching any verdict at all. In so doing, she cut off deliberations well before the point when it was clear they would no longer be fruitful. Recall that prior to summoning the foreperson for their colloquy, the trial judge gave her no opportunity to consult with the other jurors on the matter that would be discussed. So, the foreperson had no solid basis for estimating the likelihood of deadlock. Recall, as well, that almost immediately after sending the judge a note asking what would happen if they disagreed, the jury sent a note asking about lunch. Plainly, this was a group that was prepared to go on with its work.

The judge then declared a mistrial on the spot. Her entire exchange with the foreperson took three minutes, from 12:45 p.m. to 12:48 p.m. App. to Pet. for Cert. 93a–94a. The entire jury deliberations took roughly four hours. The judge gave the parties no opportunity to comment on the foreperson's remarks, much less on the question of mistrial. Cf. *Washington*, 434 U. S., at 515–516 (trial judge "gave both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial"); Fed. Rule Crim. Proc. 26.3 ("Before ordering a mistrial, the court must give each defendant and the government an opportunity to comment on the propriety of the order, to state whether that party consents or objects, and to suggest alternatives"). Just as soon as the judge declared a mistrial, she set a new pretrial date, discharged the jury, and concluded proceedings. By 12:50 p.m., everyone was free to take off for the weekend. App. to Pet. for Cert. 94a.

In addition to the remarkable "hast[e]," *Washington*, 434 U. S., at 515, n. 34, and "inexplicabl[e] abrupt[ness]," 316 Fed. Appx., at 428, with which she acted, it is remarkable what the trial judge did not do. "Never did the trial judge consider alternatives or otherwise provide evidence that

she exercised sound discretion. For example, the judge did not poll the jurors, give an instruction ordering further deliberations, query defense counsel about his thoughts on continued deliberations, or indicate on the record why a mistrial declaration was necessary." *Lett*, 466 Mich., at 227–228, 644 N. W. 2d, at 755 (Cavanagh, J., dissenting). Nor did the judge invite any argument or input from the prosecutor, make any findings of fact or provide any statements illuminating her thought process, follow up on the foreperson's final response, or give any evident consideration to the ends of public justice or the balance between the defendant's rights and the State's interests. The manner in which this discharge decision was made contravened standard trial-court guidelines.[15] The judge may not have had a constitutional obligation to take any one of

_____

[15] See, *e.g.,* ABA Standards for Criminal Justice, Discovery and Trial by Jury 15–5.4, pp. 256–257 (3d ed. 1996) ("A trial judge should be able to send the jury back for further deliberations notwithstanding its indication that it has been unable to agree. The general view is that a court may send the jury back for additional deliberations even though the jury has indicated once, twice, or several times that it cannot agree or even after jurors have requested that they be discharged. . . . [I]t is believed that a jury should not be permitted to avoid a reasonable period of deliberation merely by repeated indications that it is unhappy over its inability to agree"); Federal Judicial Center, Manual on Recurring Problems in Criminal Trials 162 (5th ed. 2001) ("Before declaring a mistrial, a trial judge must consider all the procedural alternatives to a mistrial, and, after finding none of them to be adequate, make a finding of manifest necessity for the declaration of a mistrial"); National Conference of State Trial Judges of the Judicial Administration Division of the American Bar Association and the National Judicial College, The Judge's Book 220 (2d ed. 1994) ("The jury should be given full opportunity to decide the case, considering the number of days of evidence it heard"); State Justice Institute, National Center for State Courts & National Judicial College, Jury Trial Management for the 21st Century §3, Module #3 (2009), online at http://www.icmelearning.com/jtm (as visited Apr. 30, 2010, and available in Clerk of Court's case file) ("'Deliberating jurors should be *offered assistance* when apparent impasse is reported'").

the aforementioned measures, but she did have an obliga-
tion to exercise sound discretion and thus to "assure
h[er]self that the situation warrant[ed] action on h[er]
part foreclosing the defendant from a potentially favorable
judgment by the tribunal." *Jorn*, 400 U. S., at 486 (plural-
ity opinion).

   Add all these factors up, and I fail to see how the trial
judge exercised anything resembling "sound discretion" in
declaring a mistrial, as we have defined that term. In-
deed, I fail to see how a record could disclose much less
evidence of sound decisionmaking. Within the realm of
realistic, nonpretextual possibilities, this mistrial declara-
tion was about as precipitate as one is liable to find.
Despite the multitude of cases involving hung-jury mistri-
als that have arisen over the years, neither petitioner nor
the Court has been able to identify any in which such
abrupt judicial action has been upheld. See Tr. of Oral
Arg. 12–15. Even the prosecutor felt compelled to ac-
knowledge that the trial court's decision to discharge the
jury "'clearly was error.'" 316 Fed. Appx., at 427 (quoting
postconviction hearing transcript).

   The Michigan Supreme Court's contrary conclusion was
unreasonable. The court suggested that an abuse of dis-
cretion should only be found "'when the result is "so pal-
pably and grossly violative of fact and logic that it evi-
dences not the exercise of will but perversity of will, not
the exercise of judgment but defiance thereof."'" *Lett*, 466
Mich., at 221, n. 12, 644 N. W. 2d, at 751, n. 12 (quoting
*Alken-Ziegler, Inc.* v. *Waterbury Headers Corp.*, 461 Mich.
219, 227, 600 N. W. 2d 638, 642 (1999)). Finding that the
record in this case "provides sufficient justification for the
mistrial declaration," *Lett*, 466 Mich., at 218, 644 N. W.
2d, at 750, the court concluded that the declaration consti-
tuted a permissible exercise of judicial discretion, *id.,* at
223, 644 N. W. 2d, at 753. The court listed, without ex-
plaining, several reasons for this conclusion. The jury

"had deliberated for at least four hours following a relatively short, and far from complex, trial"; it "had sent out several notes over the course of its deliberations, including one that appears to indicate that its discussions may have been particularly heated"; the parties did not object to the mistrial order; and, "[m]ost important," "the jury foreperson expressly stated that the jury was not going to reach a verdict." *Ibid.;* see *ante*, at 10 (reprising this list).[16]

These reasons do not suffice to justify the mistrial order. Four hours is not a long time for jury deliberations, particularly in a first-degree murder case. Indeed, it would have been "remarkable" if the jurors "could review the testimony of all [the] witnesses in the time they were given, let alone conclude that they were deadlocked." 507 F. Supp. 2d, at 786. The jury's note pertaining to its volume level does not necessarily indicate anything about the "heated[ness]," *Lett*, 466 Mich., at 223, 644 N. W. 2d, at 753, of its discussion. "[T]here is no other suggestion in the record that such was the case, and the trial judge did not draw that conclusion." 507 F. Supp. 2d, at 786. Al-

———————

[16] Like the trial court before it, the Michigan Supreme Court did not make any factual findings to bolster its unreasonable legal conclusion. As the State Court of Appeals noted, the trial judge declared a mistrial as soon as she extracted a suggestive answer from the foreperson. She "never even found on the record that the jury was genuinely deadlocked." *People* v. *Lett*, No. 209513, 2000 WL 33423221, \*4 (Apr. 21, 2000) *(per curiam);* see also *People* v. *Lett*, 466 Mich. 206, 225, 644 N. W. 2d 743, 754 (2002) (trial court did not "articulate a rationale on the record"). The Michigan Supreme Court expressly declined to commit to the position that the jury really was deadlocked or that manifest necessity really did exist. See, *e.g., id.,* at 220, 644 N. W. 2d, at 751 ("The issue is not whether this Court would have found manifest necessity"). Accordingly, even if 28 U. S. C. §2254(e)(1) were to apply to this appeal, there were no "determination[s] of a factual issue made by a State court" that we would have to "presum[e] to be correct." In any event, none of the relevant facts in the case are disputed, and no argument concerning §2254(e)(1) was properly raised in this Court or passed upon below.

though it would have been preferable if Lett had tried to lodge an objection, defense counsel was given no meaningful opportunity to do so—the judge discharged the jury simultaneously with her mistrial order, counsel received no advance notice of either action, and he may not even have been informed of the content of the jury's notes. See *ante*, at 2; 316 Fed. Appx., at 428 ("At no point before the actual declaration of the mistrial was it even mentioned on the record as a potential course of action by the court. The summary nature of the trial court's actions . . . rendered an objection both unlikely and meaningless" (internal quotation marks omitted)). Counsel's failure to object is therefore legally irrelevant.[17] And, as detailed above, the foreperson's remarks were far more equivocal and ambiguous, in context, than the Michigan Supreme Court allowed.

The Michigan Supreme Court's defense of the trial court's actions is thus weak on its own terms. It collapses entirely under the weight of the many defects in the trial court's process, virtually all of which the court either overlooked or discounted.

The unreasonableness of the Michigan Supreme Court's decision is highlighted by the decisions of the three other courts that have addressed Lett's double jeopardy claim, each of which ruled in his favor, as well as the dissent filed by two Michigan Supreme Court Justices and the

_____

[17] See *Jorn*, 400 U. S., at 487 (plurality opinion) ("[I]ndeed, the trial judge acted so abruptly in discharging the jury that, had the . . . defendant [been disposed] to object to the discharge of the jury, there would have been no opportunity to do so"); see also *Lett*, 2000 WL 33423221, *2 (noting that failure to object to the jury's discharge does not constitute consent under Michigan law). While a defendant's affirmative request for or consent to a mistrial may be relevant to the double jeopardy inquiry, see, *e.g., Jorn*, 400 U. S., at 485 (plurality opinion), we have never suggested that defendants must object to such orders to preserve a claim, much less object to an order issued *sua sponte* and without any advance notice.

opinion of the State's own prosecutor. This Court's decision unfortunately compounds the deleterious consequences of the Michigan Supreme Court's ruling. "Although the trial judge's decision is entitled to great deference, it is not the place of a reviewing court to extract factoids from the record in an attempt to salvage a bad decision." 507 F. Supp. 2d, at 787.

## III

The Court does not really try to vindicate the Michigan Supreme Court on the merits, but instead ascribes today's outcome to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The foregoing analysis shows why the Michigan Supreme Court's ruling cannot be saved by 28 U. S. C. §2254(d)(1), however construed. That ruling was not only incorrect but also unreasonable by any fair measure. Three particular facets of the Court's AEDPA analysis require a brief comment.

First, the fact that the substantive legal standard applied by the state court "is a general one" has no bearing on the standard of review. *Ante*, at 11. We have said that "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough* v. *Alvarado*, 541 U. S. 652, 664 (2004). But this statement stands only for the unremarkable proposition that more broadly framed rules will tend to encompass a broader set of conforming applications. Regardless of the nature of the legal principle at issue, the task of a federal court remains the same under §2254(d)(1): to determine whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law." General standards are no less binding law than discrete rules.[18]

─────────
[18] In recognition of this basic insight, our precedents "have made clear" that a state-court decision may be "unreasonable" within the meaning of §2254(d)(1) when the "state court has misapplied a 'govern-

Second, I do not agree that the Federal Court of Appeals "erred" by "rel[ying] upon its own decision" applying *Arizona* v. *Washington*. *Ante*, at 11. The Sixth Circuit was well aware that its own decision "does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" *Ante*, at 11–12 (quoting §2254(d)(1)). The panel expressly stated that it "review[ed] the Michigan Supreme Court's decision to determine only whether it was objectively unreasonable in light of the holdings of the Supreme Court." 316 Fed. Appx., at 425. The panel examined its own precedents not as the relevant "clearly established Federal law" under AEDPA, but as a tool for illuminating the precise contours of that law. Lower courts routinely look to circuit cases to "provide evidence that Supreme Court precedents ha[ve] clearly established a rule as of a particular time or [to] shed light on the 'reasonableness' of the state courts' application of existing Supreme Court precedents." 2 R. Hertz & J. Liebman, Federal Habeas Corpus Practice and Procedure §32.3, p. 1585, n. 10 (5th ed. 2005) (hereinafter Hertz & Liebman). This is a healthy practice—indeed, a vital practice, considering how few cases this Court decides—and we have never disapproved it.

Finally, I do not agree that AEDPA authorizes "the dual layers of deference" the Court has utilized in this case. *Ante*, at 11. There is little doubt that AEDPA "directs federal courts to attend to every state-court judgment with utmost care." *Williams*, 529 U. S., at 389 (opinion of

_____

ing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" *Wiggins* v. *Smith*, 539 U. S. 510, 520 (2003) (quoting *Lockyer* v. *Andrade*, 538 U. S. 63, 76 (2003)); see also *Williams* v. *Taylor*, 529 U. S. 362, 413 (2000). This is a critical feature of our AEDPA jurisprudence. Federal habeas review would be meaningless if, for relief to be granted, we required a perfect congruence between the facts that gave rise to our governing precedents and the facts that confronted the state court in any particular case.

STEVENS, J.). But the statute never uses the term "defer-ence," and the legislative history makes clear that Con-gress meant to preserve robust federal-court review. *Id.,* at 386–387; see also Hertz & Liebman §32.3, at 1587–1589, n. 13 (summarizing congressional record and noting that "[t]he aspect of prior practice that most troubled AEDPA's supporters was the federal court's inattention to, and lack of respect for, state court decisions that the fed-eral court, if it only looked, would find to be legally cor-rect"). Any attempt to prevent federal courts from exercis-ing independent review of habeas applications would have been a radical reform of dubious constitutionality, and Congress "would have spoken with much greater clarity" if that had been its intent. *Williams*, 529 U. S., at 379 (opin-ion of STEVENS, J.).

So on two levels, it is absolutely "necessary for us to decide whether the Michigan Supreme Court's decision . . . was right or wrong." *Ante*, at 11, n. 3. If a federal judge were firmly convinced that such a decision were wrong, then in my view not only would he have no statutory duty to uphold it, but he might also have a constitutional obli-gation to reverse it. And regardless of how one conceptu-alizes the distinction between an incorrect and an "unrea-sonable" state-court ruling under §2254(d)(1), one must always determine whether the ruling was wrong to be able to test the magnitude of any error. Substantive and meth-odological considerations compel federal courts to give habeas claims a full, independent review—and then to decide for themselves. Even under AEDPA, there is no escaping the burden of judgment.

\*    \*    \*

In this case, Reginald Lett's constitutional rights were violated when the trial court terminated his first trial without adequate justification and he was subsequently prosecuted for the same offense. The majority does not

appear to dispute this point, but it nevertheless denies Lett relief by applying a level of deference to the state court's ruling that effectively effaces the role of the federal courts. Nothing one will find in the United States Code or the United States Reports requires us to turn a blind eye to this manifestly unlawful conviction.

I respectfully dissent.