

# NUMBER 13-13-00371-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

PETER ANTHONY TRAYLOR,            Appellant,

**v.**

THE STATE OF TEXAS,            Appellee.

**On appeal from the 366th District Court
of Collin County, Texas.**

# O P I N I O N

**Before Chief Justice Valdez and Justices Rodriguez and Benavides
Opinion by Chief Justice Valdez**

We issued our original opinion in this cause on May 25, 2017. The State filed a motion for rehearing. After due consideration, and within our plenary power, we *sua sponte* withdraw our previous opinion and judgment and substitute the following opinion

and accompanying judgment in their place. *See* TEX. R. APP. P. 19.1(b). The State's motion for rehearing is denied.

A jury found appellant Peter Anthony Traylor guilty of first-degree burglary of a habitation, and the trial court sentenced him to twenty years in prison. *See* TEX. PENAL CODE ANN. § 30.02 (West, Westlaw through Ch. 49, 2017 R.S.). By two issues, Traylor contends that his conviction violates two amendments to the United States Constitution: (1) the Sixth Amendment's speedy-trial clause, *see* U.S. CONST. AMEND. VI; and (2) the Fifth Amendment's double jeopardy clause, *see* U.S. CONST. AMEND. V. We reverse and render and remand.

## I. BACKGROUND[1]

We separate the chronological facts pertinent to Traylor's appellate issues into the following three categories: (1) procedural history leading up to Traylor's first trial; (2) Traylor's first trial; and (3) Traylor's second trial and conviction.

## A. Procedural History Leading Up to Traylor's First Trial

On September 14, 2010, Traylor was arrested for burglary of a habitation. Three months later, the State charged him with first-degree burglary of a habitation, alleging that, on or about July 9, 2010, Traylor "intentionally and knowingly enter[ed] a habitation, without the effective consent of [his ex-mother-in-law], the owner thereof, and attempted to commit and committed aggravated assault against [her]."

For fourteen months, Traylor awaited trial in custody. During this fourteen-month period, Traylor: (1) filed several pro se motions requesting that his case be "dismissed"

---

[1] This case is before the Court on transfer from the Fifth Court of Appeals pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through Ch. 49, 2017 R.S.).

2

on speedy trial grounds; (2) filed a civil lawsuit in federal court against his attorney for violating his right to a speedy trial, among other things; and (3) filed a motion requesting that his case be set for a "hearing" at the beginning of his thirteenth month in custody.

While Traylor remained in custody making these filings, his appointed counsel filed: (1) a motion for the appointment of a private investigator, stating that "there are a number of witnesses who must be sought out and interviewed, [which] can only be done properly and effectively through the use of a private investigator;" (2) a motion requesting notice of the State's intent to offer evidence of an extraneous offense under Texas Rule of Evidence 404(b); and (3) a motion requesting discovery of the State's evidence.

On the thirteenth month of Traylor's pretrial incarceration, Traylor's appointed attorney filed a motion to withdraw from the case after Traylor accused him of professional misconduct. The trial court granted counsel's motion to withdraw. Later that month, the trial court appointed new counsel for Traylor who filed a motion entitled, "Reservation of Speedy Trial Rights" on his behalf. This motion, in relevant part, stated that:

> [Traylor] has frequently, consistently, and cogently filed written requests/demands for a speedy trial.
>
> . . .
>
> While reserving his rights to a speedy trial and without waiving them in any fashion, [Traylor] recognizes the equally important right to effective assistance of counsel secured by the Sixth Amendment of the United States Constitution and agrees to the continuance of his trial presently set [in the coming month] until sometime agreed upon by the parties and approved by the Court. In addition to the legitimate need of new counsel to conduct his own investigation into the facts surrounding this case, [Traylor] further understands that his new counsel has trials set in other felony courts [in the coming month,] including a "set to go" Murder case[.]
>
> WHEREFORE, PREMISES CONSIDERED, [Traylor] prays the Court acknowledge this Reservation of Speedy Trial, remain responsive to [his]

3

desire for a speedy trial, [and] continue this cause to a time when undersigned counsel can be ready for an effective trial.

In response to this motion, the trial court granted Traylor a seven-month continuance. In addition to continuing the case, the trial court released Traylor from custody on a personal recognizance bond pending trial.

Six months after being released on bond, and one month before the scheduled trial date, Traylor requested another continuance in order "to properly prepare his case for trial." The trial court granted Traylor's request and continued the case for an additional five months. Traylor requested no more continuances, and he was tried for the first time at the expiration of the five-month continuance.

## B.      Traylor's First Trial

At the close of the evidence on Traylor's first trial, the trial court submitted its charge to the jury. The jury charge instructed the jury to first consider whether the State proved Traylor's guilt beyond a reasonable doubt with respect to first-degree burglary of a habitation as alleged in the indictment. The trial court further instructed the jury that, "if you have a reasonable doubt [regarding Traylor's guilt for that offense] . . ., you will next consider whether he is guilty of the lesser-included-offense of" second-degree burglary of a habitation. The only difference between the two offenses was that the jury did not have to find that Traylor used a deadly weapon in order to convict him of second-degree burglary. After receiving the jury charge, the jury retired to deliberate.

During the first three hours of deliberation, the trial court responded to several routine notes sent by the jury foreperson concerning certain evidence admitted at trial. However, by the fourth hour of deliberation, the jury reported that it was deadlocked. In a follow-up note to the trial court, the foreperson indicated that, although the jury

4

unanimously agreed that Traylor was "not guilty" of the first-degree burglary, they were split seven/five favoring "not guilty" on the lesser-included offense of second-degree burglary. In response to the jury note, the trial court sent the jury back to continue deliberating.

After approximately three hours of additional deliberation, the foreperson delivered another note to the trial court, in which the foreperson indicated that the jury was now split eight/four favoring "not guilty." The foreperson's note further indicated that the jurors were at an "impasse with [two jurors] for 'not guilty' and [two jurors] for 'guilty' who have stated they will not (underlined in original) change their position." Upon receiving this note, the trial court called the jury into courtroom and made the following observations:

> I received your note . . . indicating that the jury did not believe that [Traylor] was guilty of [first-degree burglary], but that there was disagreement amongst jurors [regarding the] lesser-included offense [of second-degree burglary] and that you were hung up on that issue and that the vote apparently changed by only one juror [after three additional hours of deliberation].

After making these observations, the trial court asked the foreperson to state whether the jury is "hopelessly deadlocked." In response to the trial court's question, the foreperson replied: "I used the word impasse, but I suppose deadlock is probably the legal term. But we are at a point where we have [four jurors who] stated emphatically that they won't change their position."

At this point, the State requested that the trial court declare a mistrial based on jury deadlock. Traylor did not join the State's request for a mistrial. Instead, Traylor asked the trial court to send the jury back to deliberate "a little bit longer" with the aid of an *Allen* instruction, which had not yet been submitted to the jury. An *Allen* instruction, or "dynamite charge," is a supplemental charge sometimes given to a jury that declares itself

5

deadlocked. *See Barnett v. State*, 189 S.W.3d 272, 277 n.13 (Tex. Crim. App. 2006) (citing *Allen v. United States*, 164 U.S. 492 (1896)). The *Allen* instruction reminds the jury that if it is unable to reach a verdict, a mistrial will result, the case will still be pending, and there is no guarantee that a second jury would find the issue any easier to resolve. *Id.* Instead of sending the jury back to deliberate with an *Allen* instruction, the trial court declared a mistrial. The trial court stated:

> The testimony [of] this case consisted of one day essentially, and the jury's been deliberating for about eight hours, almost as much time deliberating as time they spent hearing the evidence in this case. Based on the jury's statement that they don't believe that further deliberations would result in a verdict in this case, the Court declares a mistrial.

After declaring a mistrial, the trial court discharged the jury, released Traylor on bond pending a retrial, and scheduled a retrial to take place five months later.

One week before the scheduled retrial date, Traylor requested a continuance of the trial. The trial court denied Traylor's request. Later that week, Traylor filed a motion to dismiss the indictment on speedy trial grounds, stating that he had been "substantially prejudiced by [the] lengthy delay in prosecution [, which] likely allowed witness memory to fade and makes marshalling evidence for the defense more difficult." The trial court denied Traylor's motion to dismiss without a hearing, and the case proceeded to trial at the scheduled time.

## C. Traylor's Second Trial and Conviction

Traylor stood trial a second time for first-degree burglary. As in the first trial, the jury charge instructed the jury to consider the lesser-included offense of second-degree burglary if there was a reasonable doubt about his guilt on first-degree burglary. This

6

time, the jury found Traylor guilty of first-degree burglary, and the trial court sentenced him to twenty years in prison. This appeal followed.

## II. SPEEDY TRIAL

By his first issue, Traylor argues that he was denied the right to a speedy trial under the Sixth Amendment to the United States Constitution.

## A. Standard of Review and Applicable Law

The Sixth Amendment guarantees the defendant a speedy trial. U.S. CONST. AMEND. VI. In addressing a speedy-trial claim, the United States Supreme Court has laid out four factors that a court should consider: "(1) the length of delay, (2) the State's reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice to the defendant because of the length of delay." *See Barker v. Wingo*, 407 U.S. 514, 530 (1972). Courts commonly refer to these factors as the *Barker* factors.

Before a court engages in an analysis of each *Barker* factor, the defendant must "first make a threshold showing that 'the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." *Gonzales v. State*, 435 S.W.3d 801, 808–09 (Tex. Crim. App. 2014) (quoting *Doggett v. U.S.*, 505 U.S. 647, 651–52 (1992)). Generally, an interval of twelve months between the time of the accusation and the time of trial is presumptively prejudicial, which would trigger an analysis of each *Barker* factor. *See Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003).

When reviewing a trial court's application of the *Barker* factors, a reviewing court uses the same standard of review as in the context of a motion to suppress. *See Gonzales*, 435 S.W.3d at 808–09. That is, a reviewing court gives almost total deference

7

to historical findings of fact of the trial court that the record supports but reviews de novo "whether there was sufficient presumptive prejudice to proceed to a *Barke*r analysis and the weighing of the *Barker* factors, which are legal questions."  *Id.*

## B.    Analysis

### 1.  Length of Delay

As previously mentioned, the length of the delay is measured from the time the defendant is formally accused to the time of trial.  *See id.* at 809.  Here, there was a delay of twenty-eight months between the time of the indictment and the time of Traylor's second trial.  That is over twice the amount of time required to trigger an analysis of the remaining *Barker* factors.  *See Shaw*, 117 S.W.3d at 889.  When the length of delay stretches well beyond the bare minimum needed to trigger a full *Barker* analysis, "the length of a delay weighs against the State, and the longer the delay, the more the defendant's prejudice is compounded."  *Gonzales*, 435 S.W.3d at 809 (citations omitted). We conclude that this factor—the length of delay—weighs against the State.

### 2.  Reason for the Delay

This factor looks into the State's reason for the delay.  *See id.* at 809–10.  "When assessing the reasons for delay, we assign different weights to different reasons."  *Id.* For example, a deliberate attempt by the State to delay the trial in order to hamper the defense should be weighed "heavily against the State."  *Id.*  On the other hand, a more neutral reason "such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the [State] rather than with the defendant."  *Id.*  However, when the record is silent regarding the reason for the delay, "a court may presume neither

a deliberate attempt on the part of the State to prejudice the defense nor a valid reason for the delay." *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003).

Here, there were different reasons for the twenty-eight-month delay. The trial was initially delayed because of a communication breakdown between Traylor and his former counsel. Traylor wrote letters to the trial court and filed a federal lawsuit complaining that his former counsel rarely visited him in jail and never returned his phone calls.[2] As the fact-finder on Traylor's speedy-trial motion, the trial court was not required to accept, as true, everything Traylor said about his former counsel. In any event, while there was an apparent communication breakdown between Traylor and his former counsel, the record shows that Traylor's former counsel asked for funding to hire a private investigator because a number of witnesses had not been sought out or interviewed. The trial court could have reasonably found that the trial was initially delayed, in part, because Traylor, through counsel, was seeking out witnesses favorable to his defense.

Next, Traylor's trial was delayed because his former counsel withdrew from the case, and his new counsel needed time to prepare for trial. The trial court granted two continuances, which Traylor requested and which delayed his trial an additional twelve months. Finally, Traylor's trial was delayed because his first trial ended in a mistrial and needed to be retried. None of these reasons indicate a deliberate attempt by the State to delay the trial in order to hamper Traylor's defense. This *Barker* factor does not weigh heavily against the State.

---

[2] Traylor named the State as a defendant in the federal lawsuit as well. However, Traylor's complaint makes clear that the State was alleged to be a responsible party only to the extent that it appointed former counsel to represent him. Other than his former counsel, Traylor did not identify any other State actor alleged to be responsible for violating his constitutional rights.

9

### 3. Assertion of Right

The third *Barker* factor evaluates whether a defendant actually wanted a speedy trial. *See Cantu v. State*, 253 S.W.3d 273, 283 (Tex. Crim. App. 2008). To determine whether a defendant is being deprived of the right to a speedy trial, strong evidentiary weight is assigned to the defendant's assertion of his right to a speedy trial. *See Gonzales*, 453 S.W.3d at 810–11. Although the defendant has no duty to bring himself to trial, he does have the responsibility to assert his right to a speedy trial. *See Cantu*, 253 S.W.3d at 283. Generally, filing for a dismissal instead of a speedy trial will weaken a speedy-trial claim because it shows the defendant's desire to have no trial at all rather than a speedy one. *Id.*

Here, during the time that Traylor remained in custody pending trial, he wrote the trial court several times. In all but one letter, Traylor requested that his case be "dismissed" on speedy trial grounds.[3] After being released from custody, Traylor requested that his trial be continued. Finally, on the eve of his second trial, Traylor urged that his case be "dismissed" on speedy trial grounds after his request for continuance was denied. The record supports a finding that Traylor desired to have no trial at all rather than a speedy one. *See id.* This weakens Traylor's speedy-trial claim and does not weigh heavily in his favor.

### 4. Prejudice Caused by the Delay

The last *Barker* factor looks at prejudice to the defendant as a result of the delay. *See State v. Munoz*, 991 S.W.2d 818, 826 (Tex. Crim. App. 1999). Prejudice is assessed

---

[3] In one letter, Traylor requested that the trial court set his case for a "hearing" at the beginning of his thirteenth month in custody. However, the letter does not specify the purpose of the hearing or otherwise request a trial.

10

"in the light of the interests which the speedy trial right is designed to protect." *Id.* These interests are: "(1) preventing oppressive pretrial incarceration, (2) minimizing anxiety and concern of the accused, and (3) limiting the possibility that the defense will be impaired." *Id.* Of these subfactors, "the most serious is the [third], because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*

The record shows that Traylor awaited trial in custody for approximately fourteen months, which is about half the time that his case awaited trial. During this time, Traylor expressed increasing frustration at his former counsel's alleged lack of communication and alleged lack of diligence in pursuing a prompt and favorable resolution of his case. Notably, Traylor alleged that he missed the opportunity to witness the birth of his child because former counsel did not request a reduction in bond until after his child was born. The period of Traylor's pretrial incarceration, during which he expressed concern about former counsel, certainly does not go unnoticed by this Court. However, we would observe that the trial court responded to Traylor's complaints by appointing new counsel, and by freeing Traylor of further pretrial incarceration through the issuance of a personal recognizance bond for the latter half of the time that his case awaited trial. Traylor never made any complaint about the competence or diligence of his new counsel, and there is no indication that his anxiety or concern continued after he was released on bond. These measures taken by the trial court mitigated the prejudicial effect of the first two interests that the right to a speedy trial was designed to protect—i.e., preventing oppressive pretrial incarceration and minimizing anxiety and concern of the accused. *See id.*

We now turn to the third (and most important) interest which the speedy trial right is designed to protect—limiting the possibility that the defense will be impaired. *See id.*

11

Traylor alleged in his motion to dismiss that the delay impaired his defense because it "allowed witness memory to fade and ma[de] marshalling evidence for the defense more difficult." However, as the State points out, Traylor offered no evidence to support this allegation. Nevertheless, the United States Supreme Court has held that affirmative proof of prejudice is not essential to every speedy trial claim, because excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or even identify. *See Doggett*, 505 U.S. at 655 (observing that "impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown"); *Gonzales*, 435 S.W.3d at 812. However, the presumption of prejudice to a defendant's ability to defend himself is extenuated by the defendant's acquiescence in some or all of the delay. *Doggett*, 505 U.S. at 658; *Shaw*, 117 S.W.3d at 890.

Here, Traylor acquiesced in over half of the delay by requesting multiple continuances of his trial after being released on bond. Thus, even assuming without deciding that a delay of twenty-eight months is sufficiently excessive to entitle Traylor to a presumption of prejudice, we conclude that the record supports the trial court's implied finding that Traylor's acquiescence in the delay vitiated any presumption of prejudice that might have existed as a result of what might be called an excessive delay. *See Gonzales*, 435 S.W.3d at 815 (finding speedy trial violation where defendant did not acquiesce to six-year delay); *see also Berlanga v. State*, No. 13-14-00717-CR, 2016 WL 3225292, at *10 (Tex. App.—Corpus Christi June 9, 2016) (mem. op., not designated for publication) (finding no speedy trial violation where defendant acquiesced to some of six-year delay); *Aranda v. State*, No. 04–14–00787–CR, 2016 WL 1043102, at * 5 (Tex. App.—San

Antonio March 16, 2016, pet. filed) (mem. op., not designated for publication) (finding no speedy trial violation where defendant acquiesced to five-year delay). For the foregoing reasons, we conclude that the fourth *Barker* factor does not weigh against the State.

### 5. Balancing Test

Having addressed the four *Barker* factors, it is necessary to balance them. Favoring a speedy-trial violation is the twenty-eight month delay between the time Traylor was charged and the time of his second trial. This delay is sufficient to trigger a full *Barker* analysis, which we discussed above. Although Traylor's trial was initially delayed because of a communication breakdown between Traylor and his former counsel, a large portion of the delay was attributable to Traylor's multiple requests to continue the trial. We found that the second *Barker* factor did not weigh heavily against the State. We further found that the third *Barker* factor did not weigh in Traylor's favor because the record supported a finding that he desired to have no trial at all rather than a speedy one. Finally, we found that the fourth *Barker* factor did not weigh against the State because Traylor acquiesced in the delay, which vitiated any presumption of prejudice that might have existed as a result of the delay. We hold that the weight of the four factors, when balanced together, militates against finding a violation of Traylor's right to a speedy trial. Accordingly, we conclude that Traylor's right to a speedy trial was not violated, and the trial court did not err in denying his motion to dismiss. We overrule Traylor's first issue.

### III. DOUBLE JEOPARDY

By his second issue, Traylor contends that his conviction for first-degree burglary violates the Fifth Amendment's double jeopardy clause. *See* U.S. CONST. AMEND. V.

**A.    Applicable Law and Standard of Review**

The double jeopardy clause commands that "No person shall be subject for the same offence to be twice put in jeopardy of life or limb."  *Id*.  The clause prohibits the State from repeatedly attempting to convict a defendant of an offense, thereby "subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."  *Blueford v. Arkansas*, 566 U.S. ___, 132 S. Ct. 2044, 2050 (2012)*.*

Consistent with the double jeopardy clause's general prohibition on successive trials, a defendant once acquitted may not be again subjected to a second trial for the same offense.  *See U.S. v. Scott*, 437 U.S. 82, 96 (1978).  To permit a second trial following acquittal would grant to the State what the clause forbids:  the proverbial "second bite at the apple."  *Burks v. United States*, 437 U.S. 1, 11 (1978) (recognizing that the double jeopardy clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first trial).

The United States Supreme Court has defined an "acquittal" for double jeopardy purposes as "a resolution, correct or not, of some or all of the factual elements of the offense charged" in the defendant's favor.  *Sanabria v. United States*, 437 U.S. 54, 71 (1978); *see United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977).  In ascertaining whether an acquittal has occurred, the form of the fact-finder's resolution "is not to be exalted over [its] substance"; at the same time, however, the form of the fact-finder's resolution but cannot be "entirely ignored."  *Sanabria*, 437 U.S. at 71.

14

When a jury is discharged before reaching a verdict, the prosecution necessarily does not culminate in a conviction or an acquittal. When this occurs, a question arises whether the double jeopardy clause permits a retrial of the defendant for the same offense. The answer is "yes" if a manifest necessity existed to discharge the jury based on a "genuine deadlock" among the jurors. *See Renico v. Lett*, 559 U.S. 766, 773 (2010); s*ee also Downum v. United States*, 372 U.S. 734, 736 (1963) (observing that a genuinely deadlocked jury is a "classic example" of when a manifest necessity exists to try the defendant twice).

Trial judges are accorded "great deference" in determining whether there is a genuine deadlock among jurors in a given case. *Id.* Trial judges are accorded this level of deference because they are in the "best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate." *Renico*, 559 U.S. at 774. It has been said that, in the absence of such deference, trial judges might otherwise "employ coercive means to break the apparent deadlock, thereby creating a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors." *Id.* (internal quotations omitted). Thus, the United States Supreme Court has expressly declined to require the "mechanical application of any rigid formula when trial judges decide whether jury deadlock warrants a mistrial." *Id.* at 775. As such, before declaring a mistrial based on jury deadlock, a trial judge is not required to "force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with (or obtain the consent of) either the prosecutor or defense

15

counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the impasse." *Id.*

However, this is not to say that a reviewing court should grant absolute deference to a trial judge in determining whether to declare a mistrial based on jury deadlock. *Id.* If the record reveals that the trial judge has failed to exercise the "sound discretion entrusted to him, the reason for such deference by a[] [reviewing court] court disappears." *Id.*

In determining whether a trial judge has exercise sound discretion to discharge a jury based on a deadlock, reviewing courts have generally considered the length of time the jury deliberated in light of the nature of the case and the evidence. *See Ex parte Perusquia*, 336 S.W.3d 270, 275–76 (Tex. App.—San Antonio 2010, pet. ref'd). Specifically, reviewing courts have considered "the type and complexity of the evidence, whether expert testimony is involved, the number of witnesses, the number of exhibits. . ., the complexity of the charge, whether the jury moved towards agreement during the period of deliberation, and the nature and extent of communication from the jury." *Id.*

**B.    Analysis**

Traylor's first trial ended in a mistrial after the trial court determined that the jury was deadlocked on the lesser-included offense of second-degree burglary and that further deliberation would be futile.  Traylor was tried a second time, and the jury found him guilty of first-degree burglary as charged in the indictment.  The question is whether Traylor's conviction for first-degree burglary violates the double jeopardy clause's prohibition on successive trials.  The answer is "yes" if Traylor was, in substance, acquitted of that offense at his first trial.  *See Scott*, 437 U.S. at 96.

16

In *Blueford*, after a few hours of deliberation, the jury foreperson reported that all twelve jurors were unanimous against guilt on the charged offense but that they were deadlocked on the lesser-included offense. *Blueford*, 566 U.S. at ___, 132 S. Ct. at 2049. The trial court told the jury to continue to deliberate. *Id.* When the jury returned a half hour later, the foreperson stated that they had not reached a verdict. *Id.* The foreperson did not state as to which offense they had not reached a verdict. *Id.* The court declared a mistrial and discharged the jury. *Id.* Although the jury never reached a formal verdict prior to being discharged, the defendant argued that the foreperson's report that all twelve jurors were unanimous against guilt on the charged offense amounted to an acquittal on that offense, which barred a second prosecution. *Id.* at 2050.

The United States Supreme Court disagreed, because the foreperson's report "lacked the finality necessary" to amount to an acquittal for double jeopardy purposes. *Id.* The Court relied on the following: (1) deliberations resumed after the report, thereby making it at least possible that some jurors reconsidered the defendant's guilt on the charged offense; (2) nothing in the jury charge prohibited the jurors from reconsidering their votes on the charged offense; and (3) at the conclusion of deliberation, the foreperson stated only that the jury was "unable to reach a verdict" but gave no indication whether it was still the case that all twelve jurors were unanimous against guilt on the charged offense. *Id.* at 2050–51. However, by addressing and rejecting the defendant's argument, the Court recognized in *Blueford* that, even short of a formal verdict of acquittal, a jury's post-deliberation communication may, in an appropriate case, contain the finality necessary to amount to an acquittal for double jeopardy purposes. *Id.*

17

Here, like in *Blueford*, the foreperson reported that all twelve jurors were unanimous against guilt on the charged offense but that they were deadlocked seven/five against guilt on the lesser-included offense. Also like in *Blueford*, the jury resumed deliberations after the foreperson's report, and nothing in the jury charge prohibited the jurors from reconsidering their votes on the charged offense during that time. If the record in this case contained only the foreperson's initial report, we could confidently say, as did the *Blueford* Court, that it was at least possible that some jurors might have reconsidered Traylor's guilt as to the charged offense after continued deliberations. However, we cannot confidently entertain that possibility based on what transpired after jury deliberation concluded. Unlike in *Blueford*, the record in this case shows that, at the end of jury deliberation, the foreperson reported that the jurors were now deadlocked eight/four against guilt, which prompted the following colloquy between the trial court and the foreperson:

Trial court: I received your note . . . indicating that the jury did not believe that [Traylor] was guilty of [the charged offense], but that there was disagreement amongst jurors [regarding the] lesser-included offense and that you were hung up on that issue and that the vote apparently changed by only one juror [after several more hours of deliberation]. So the note that I received [is] that the jury is hopelessly deadlocked; is that correct?

Foreperson: I used the word impasse, but I suppose deadlock is probably the legal term.

As the trial court's comments demonstrate, prior to the end of deliberation, the jury was unanimous against guilt on the charged offense but deadlocked seven/five against guilt on the lesser-included offense; however, by the end of deliberation, only one juror's vote had changed from guilty to not guilty on the lesser-included offense, making the final vote eight/four against guilt on the lesser-included offense. The foreperson then

18

confirmed that there was an impasse or deadlock in response to the trial court's question, as framed. The foreperson's post-deliberation report of an eight/four deadlock against guilt, combined with her post-deliberation answer to the trial court concerning that deadlock, establishes that all twelve jurors remained unanimous against guilt on the charged offense and foreclosed any reasonable speculation that the deadlock related to the charged offense rather than the lesser-included offense. *Cf. id.* (noting that the post-deliberation record was silent regarding whether the jurors still believed that the defendant was not guilty of the charged offense). Thus, the post-deliberation record in this case shows what the record in *Blueford* did not: a final resolution indicating that Traylor was not guilty of the charged offense of first-degree burglary. We conclude that, unlike *Blueford*, the jury's communication contained the finality necessary to amount to an acquittal on first-degree burglary for double jeopardy purposes; the trial court clearly understood that to be the jury's verdict, and neither the State nor Traylor, at trial or on appeal, disputes this fact.

In reaching this conclusion, we acknowledge that Texas law recognizes the existence of an informal verdict of acquittal. *See* TEX. CODE CRIM. PROC. ANN. art. 37.10(a) (West, Westlaw through Ch. 49, 2017 R.S.). Specifically, article 37.10(a) provides that a trial court "shall" render judgment in accord with the jury's verdict if the verdict is informal and it "manifestly appear[s]" that the jury intended to acquit the defendant. *Id.* Texas cases surveyed by this Court have considered whether jury communication originating from a jury note manifested a jury's intent to acquit the defendant under article 37.10(a), but none found such intent based on the records reviewed by the courts in those cases. *See State ex rel. Hawthorn v. Giblin*, 589 S.W.2d

19

431, 433 (Tex. Crim. App. 1979) (holding that a jury note—which indicated that the jury was unanimous against guilt as to the charged offense but deadlocked as to the lesser-included offense—was intended as a report on the jury's progress toward a verdict and was not plainly intended as an informal acquittal under article 37.10(a)); *Antwine v. State*, 572 S.W.2d 541, 543 (Tex. Crim. App. 1978) (holding that a note sent by a deadlocked jury—requesting that the evidence be "reopened, because the evidence presented is insufficient and inconclusive, making a true verdict impossible"—was not plainly intended as an informal acquittal); *Ex parte Zavala*, 900 S.W.2d 867, 870 (Tex. App.—Corpus Christi 1995, no writ) (holding that the jury did not plainly intend to acquit the defendant of the charged offense where the trial court heard conflicting testimony from jurors at the habeas hearing regarding whether the jury had acquitted the defendant of the charged offense); *Cardona v. State*, 957 S.W.2d 674, 677 (Tex. App.—Waco 1997, no pet.) (holding that a jury's note was not plainly intended as an acquittal as to the charged offense when it indicated only that the jury was deadlocked as to the lesser-included offense but said nothing about a decision with respect to the charged offense); *Thomas v. State*, 812 S.W.2d 346 (Tex. App.—Dallas 1991, pet. ref'd) (holding that jury notes sent by a deadlocked jury were not plainly intended as an acquittal where they showed an eleven/one split favoring guilt as to the charged offense).[4]

Mindful of this precedent, we would note that these cases were decided before the United States Supreme Court issued its opinion in *Blueford.* Thus, to the extent that

---

[4] Under this strand of case law, one Texas intermediate court concurring opinion expresses concern over "any system of laws that allows an accused to be subject to re-prosecution for [a] greater offense when a jury has (1) decided not guilty on the [greater offense], (2) become hung on a [lesser-included offense], (3) avoided announcing a complete verdict, (4) and been discharged on a motion for mistrial." *Ex parte Cantu*, 120 S.W.3d 519, 522 (Tex. App.—Corpus Christi 2003, no pet.). (Yanez, J., concurring).

incongruity, if any, exists between these cases and *Blueford*, we resolve the conflict in favor of the legal proposition we derive from *Blueford*, which is that a jury's post-deliberation communication may, in an appropriate case, contain the finality necessary to amount to an acquittal for double jeopardy purposes. *See Blueford*, 566 U.S. at ___, 132 S. Ct. at 2050–51; *see also State v. Guzman*, 959 S.W.2d 631, 633 (Tex. Crim. App. 1998) (observing that Texas courts are bound by Supreme Court precedent when deciding cases involving the United States constitution and that, if Texas case law is in conflict, Texas courts are obligated to follow the Supreme Court's federal constitutional precedent).

In sum, Traylor could not be retried for the offense of first-degree burglary without running afoul of the double jeopardy clause's prohibition on successive trials; yet that is exactly what happened at his second jury trial, which resulted in a conviction for first-degree burglary. We therefore sustain Traylor's second issue to the extent that he argues that his conviction for first-degree burglary violates the double jeopardy clause. Accordingly, we reverse the trial court's judgment convicting Traylor of first-degree burglary and render a judgment of acquittal on that charge.

## C.     Retrial on Second-Degree Burglary Permitted

Having concluded that Traylor's conviction for first-degree burglary violates the double jeopardy clause, we now consider whether Traylor could have been retried for the lesser-included offense of second-degree burglary. *See Pullin v. State*, 827 S.W.2d 1, 3 (Tex. App.—Houston [1st Dist.] 1992, no pet.) (holding that the defendant's acquittal at first trial on the charged offense did not bar retrial for the lesser-included offense on which the jury had declared itself deadlocked and was discharged). The answer is "yes" if

Traylor's first jury was genuinely deadlocked as to that offense, making it manifestly necessary to declare a mistrial. *See Renico*, 559 U.S. at 773.

At the outset, we would observe that the case was not particularly complicated; this was a one-day trial in which the State presented non-scientific evidence and testimony from five lay witnesses. *See Ex parte Perusquia*, 336 S.W.3d at 275–76 (considering the relative complexity of the case and the nature of the evidence in determining whether the trial judge exercised sound discretion to discharge a jury based on a deadlock). The trial centered on two issues: (1) whether Traylor was the person who assaulted or attempted to assault his ex-mother-in-law inside her home; and (2) if so, whether Traylor used a deadly weapon during the commission of the burglary. Although these issues are not particularly complicated, the jury spent about eight hours deliberating before being discharged. *Cf. Green v. State*, 840 S.W.2d 394, 407–08 (Tex. Crim. App. 1992) (holding that the trial court did not err in ordering jury to continue deliberations when jury reported that it was deadlocked after only six and one-half hours of deliberation even though jury had approximately five days of evidence to review involving testimony from twenty-six witnesses), *abrogated on other grounds by Trevino v. State*, 991 S.W.2d 849 (Tex. Crim. App. 1999).

As previously mentioned, approximately four hours into deliberation, the jury was unanimous against guilt on the charged offense but deadlocked seven/five against guilt on the lesser-included offense. Given the charges submitted to the jury, this meant that five jurors believed that Traylor assaulted or attempted to assault his ex-mother-in-law inside her home, but none of them believed that a deadly weapon was used. As the trial court specifically found, and as the record confirms, the jury deliberated for several more

22

hours to resolve this issue, but the deadlock only solidified—as two jurors on either side of the issue emphatically stated that their respective positions would not change. *See Ex parte Perusquia*, 336 S.W.3d at 275–76 (observing that courts reviewing the genuineness of a jury deadlock situation generally consider the complexity of the charge, whether the jury moved towards agreement during the period of deliberation, and the nature and extent of communication from the jury). Finally, as the trial court aptly observed, by the time the mistrial was declared, the jury had already spent approximately the same amount of time in the deliberation room as it did in the courtroom hearing evidence. *See* TEX. CRIM. PROC. CODE ANN. art. 36.31 (West, Westlaw through Ch. 49, 2017 R.S.) (providing that a trial court may in its discretion discharge the jury where it has been kept together for such time as to render it altogether improbable that it can agree on a verdict); *see also Ex parte Perusquia*, 336 S.W.3d at 275–76 (considering the length of time the jury deliberated in light of the nature of the case and the evidence).

Traylor argues that the trial court misjudged the disagreement among the jurors as a "deadlock" when the foreperson merely described the disagreement as an "impasse." However, the record shows that the foreperson stated that the word "deadlock" could also describe the nature of the disagreement among the jurors.

Citing *Ex parte Perusquia*, Traylor next argues that a manifest necessity did not exist to declare a mistrial because the trial court did not issue a supplemental *Allen* instruction as a last-ditch attempt to break the deadlock. *Id.* at 276–77 (upholding the trial court's decision to discharge the jury when, among other things, the jury remained deadlocked even after the trial court issued a supplemental *Allen* instruction). We disagree. Although a trial court is by no means prohibited from issuing an *Allen* instruction

23

in the face of a deadlock, the law does not require it before declaring a mistrial if the jury is genuinely deadlocked. *See Renico*, 559 U.S. at 775 (observing that a trial court is not required to "issue a supplemental jury instruction" to break an impasse before declaring a mistrial if the jury is otherwise genuinely deadlocked).

According great deference to the trial court as we must, we hold that the trial court exercised sound discretion in declaring a mistrial after determining that the jury was genuinely deadlocked regarding whether Traylor committed the lesser-included offense of second-degree burglary. We therefore overrule Traylor's second issue to the extent that he argues no manifest necessity existed to declare a mistrial. Our holding means that a retrial for second-degree burglary was not barred by double jeopardy. *See Pullin*, 827 S.W.2d at 3.

## D.    Summary

In Part III(B) of this opinion, we concluded that Traylor's conviction for first-degree burglary violated the double jeopardy clause because Traylor's first jury communicated what amounted to an acquittal as to that offense. *See Blueford*, 566 U.S. at ___, 132 S. Ct. at 2050–51. In Part III(C) of this opinion, we concluded that the double jeopardy clause did not bar a retrial for second-degree burglary because Traylor's first jury was genuinely deadlocked as to that offense. See *Renico*, 559 U.S. at 773.

## IV.    PROPER REMEDY

Traylor was found guilty of an offense barred by double jeopardy—i.e., first-degree burglary. However, there was no jeopardy bar on a retrial for second-degree burglary. In finding Traylor guilty of first-degree burglary, the jury must have necessarily found that he also committed second-degree burglary, and we conclude there is legally sufficient

24

evidence to support a conviction for second-degree burglary. As a result, the proper remedy here is to render a judgment convicting Traylor of second-degree burglary and remand the case to the trial court for sentencing on second-degree burglary. *See Thornton v. State*, 425 S.W.3d 289, 300 (Tex. Crim. App. 2014) (concluding that when an appellate court finds the evidence legally insufficient to support a conviction on a greater offense, a defendant should not receive the unjust windfall of an outright acquittal when there is legally sufficient evidence to prove that he is guilty of a lesser-included offense); *see also Arteaga v. State*, PD-1648-15, 2017 WL 2457432, at *8 (Tex. Crim. App. June 7, 2017) (extending *Thornton's* reformation remedy to jury-charge error that only impacts the greater offense so as not to afford the defendant the unjust windfall of a new trial on a lesser-included offense that the jury necessarily must have found in order to convict on the greater offense).

## V. CONCLUSION

We reverse the trial court's judgment convicting Traylor of first-degree burglary and render a judgment of acquittal on that charge and render a judgment convicting Traylor of second-degree burglary, and we remand for proceedings consistent with this opinion. *See* TEX. R. APP. P. 43.2(c).

/s/ Rogelio Valdez
ROGELIO VALDEZ
Chief Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
3rd_day of August, 2017.

25