NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0362n.06

Case No. 22-1878

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Aug 08, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| EDWARDIAN DAVIDSON, | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| FREDEANE ARTIS, Warden, | ) | |
| Respondent-Appellee. | ) | |
| | ) | OPINION |

Before: SUTTON, Chief Circuit Judge; BATCHELDER and STRANCH, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** Edwardian Davidson, a Michigan prisoner serving a life sentence for first-degree felony murder, appeals the denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. Despite denying the petition, the district court granted Davidson a certificate of appealability on his claim that his trial attorney provided constitutionally ineffective assistance of counsel by failing to request a jury instruction on involuntary manslaughter as an alternative lesser-included offense. We disagree with Davidson and AFFIRM.

**I.**

At a little before 7:00 p.m. on November 5, 2015, an elderly couple returning from dinner at a local restaurant pulled their car into the attached garage of their condominium in Sterling Heights, Michigan, a Detroit suburb. Rose Marie Bogucki, age 84, was driving and her husband Frank, age 89 and slightly infirm, was riding in the front passenger seat. Davidson waited outside in the dark and watched them pull into the garage, intending to rob them.

Once Frank was out of the parked car with the car door closed behind him, Davidson—a 6' 3", 170 lb., 46-year old man—ran up to Frank and punched him in the face so hard that he broke

Frank's jaw and the orbital bone around his left eye, leading to severe swelling and bruising of the entire left side of his face. This blow likely knocked Frank unconscious and definitely knocked Frank backwards to the ground. The force with which Frank's head hit the ground fractured the back of his skull. During this attack, Davidson also kicked or stepped on Frank's ankle, breaking it. Frank never regained consciousness and died in the hospital eight days later.

After disabling Frank, Davidson circled around the back of the car to confront Rose, who screamed at him, waving her cane, while he wrestled her purse from her, shoved her, and fled on foot. Davidson never said anything during the attack—a silent, surprise assault on Frank and a silent, forcible robbery from Rose. Rose obtained aid from a neighbor and called 911.

Later that evening, Davidson used Rose's credit cards at several local, Detroit-area gas stations—buying gas for himself, and buying gas for others in exchange for cash. A surveillance camera at one of these Detroit-area stations, a Sunoco station, captured a video of Davidson and his car while he used Rose's stolen credit card to purchase gas. From this video, the police traced the car back to Davidson, a convicted felon on parole, and used a database photo to create a photo array. Rose identified Davidson from that array with a high degree of certainty. Under police questioning, Davidson identified himself in the Sunoco video, but denied committing the attack. Police also seized his cell phone and tracked his movements on the night of the attack.

The local prosecutor charged Davidson with several offenses, including first-degree felony murder in violation of M.C.L. § 750.316(1)(b), and tried the case to a jury in Michigan state court. Rose identified Davidson at trial, emphatically and unequivocally despite a vigorous cross examination. And, with the testimony of the investigating officer, the prosecutor showed the jury the video of Davidson using Rose's stolen credit card at the Sunoco on the night of the robbery and the police interrogation video of Davidson admitting that it was he in the Sunoco video.

2

Davidson's sole defense at trial was that he did not commit the crime; that Rose had misidentified him and, moreover, that he had an alibi, namely that he was in Flint (some 60 miles away) on the night of the attack and robbery. Davidson produced four witnesses to testify to this alibi. But, in addition to presenting the Sunoco video—showing Davidson, by his own admission, in Detroit on the night of the attack—the prosecutor also called a police officer as an expert to testify about cell-tower tracking of Davidson's cell phone, which placed Davidson in and around Detroit, not Flint, on the night of the attack, though it placed Davidson in Flint on the day before the attack. On appeal, Davidson's counsel concedes that this "was an alibi for the wrong day."

Near the end of the six-day trial, at a recess prior to closing arguments, the parties had this exchange with the court about proposed jury instructions:

> Prosecutor:      I would indicate, your Honor, at this time [that] the [proposed] instructions only include felony murder and the mandatory lesser, second-degree murder. I guess I wish to know from defense if they're going to make a request for manslaughter. Because if they do, we would argue against it . . . .

> Defense:      I would make that request, your Honor. The facts as presented would clearly support—the facts as presented by the prosecutor in the case, your Honor, the fact that there is no evidence of any weapon, that there was—if you take the testimony of the medical examiner, that it was—he thought it was a fist or a punch of some type that caused the initial injury. That there's been no evidence submitted about any—intentionally causing the death. You know, a punch, where Mr. Bogucki fell and hit his head on the floor, because of that, I think the manslaughter instruction would be an appropriate request on defendant's behalf.

> Prosecutor:      I would argue against it, your Honor. Manslaughter tends to be one of these elements of heat of passion or negligence. This is a specific intent crime, where somebody specifically went in, used force to threaten and then to intimidate and to steal. As a result of that, somebody then died.
>
>      That's a completely different context than what manslaughter is meant for. And therefore, even though there was— I mean, I don't see where negligence fits into it.

> Sometimes manslaughter is also used when they're saying I did it but I didn't do it for this particular reason, I was in this state of mind. We've got the some other dude did it defense here, which then really essentially, on its own, should eliminate it.
>
> But I would indicate that that is a crime of negligence, where felony murder and the home invasion, or the robbery, is a specific intent crime. Therefore, there in fact aren't any overlapping issues and therefore we would argue against it.

The Court:                I need to see the instruction for manslaughter.

This is when the putative mistake happened. Defense counsel either provided a written copy of, or pointed the court to, Michigan's Model Criminal Jury Instruction (CJI) number 16.9, which is the instruction for *voluntary* manslaughter as a lesser-included offense. The *involuntary* manslaughter instruction is CJI number 16.10.[1] Upon reading CJI 16.9, the court explained:

The Court:                It does not appear to apply. The instruction reads:

> The crime of murder may be reduced to involuntarily [sic: CJI 16.9 says "voluntary," not involuntary] manslaughter if the defendant acted out of passion or anger brought about by adequate cause and before the defendant had reasonable time to calm down. For manslaughter, the following two things must be present:
>
> First, the defendant acted—his thinking must be disturbed by emotional excitement to the point that a reasonable person might have acted on impulse—there's no indication, there's no evidence

---

[1] Michigan CJI 16.10 for involuntary manslaughter provides alternatives for different scenarios, which for the present scenario would be modified approximately as follows, to say:

> [The defendant is charged with the crime of _____ / You may also consider the lesser charge of] involuntary manslaughter. To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt:
>
> First, that the defendant caused the death of [name deceased], that is, that [name deceased] died as a result of [state alleged act causing death].
>
> Second, in doing the act that caused [name deceased]'s death, the defendant intended to injure [name deceased]. The act charged in this case is assault and battery. The prosecution must prove the following beyond a reasonable doubt: First, that the defendant committed a battery on [name deceased]. A battery is a forceful or violent touching of the person or something closely connected with the person. The touching must have been intended by the defendant, that is, not accidental, and it must have been against [name deceased]'s will. Second, that the defendant intended to injure [name deceased].

Michigan Model Criminal Jury Instructions (numbering and explanatory instructions omitted; brackets in original).

to support such a conclusion—without thinking twice, from passion instead of judgment. This emotional excitement must have been the result of something that would have caused a reasonable person to act rashly or on impulse.

Again, there's no evidence to support such a conclusion from which a jury, a reasonable jury could conclude, if this was from passion instead of judgment.

The second element is equally not applicable. The defendant must have acted before a reasonable time had passed to calm down—again, there's no evidence to support such a conclusion. Therefore, the instruction will not be given.

Defense:          Thank you, your Honor.

Davidson's contention is that his counsel made a mistake due to inattention, unpreparedness, or otherwise; namely that, despite initially arguing for *involuntary* manslaughter, at least in concept (i.e., absence of intent), his defense counsel mistakenly asked for—or at least acquiesced in the court's assessment and determination (denial) of—an instruction for *voluntary* manslaughter (i.e., heat of passion or impulse).[2]

Three points bear recognition. One, the prosecutor opposed an involuntary-manslaughter instruction because this was a specific-intent crime (assault and robbery), not a crime resulting from negligence. Two, a manslaughter theory (either voluntary or involuntary) directly refutes the defense theory presented at trial, which the prosecutor dubbed the "some other dude did it defense." Therefore, it is not clear that the court would have given an involuntary-manslaughter instruction even if it had been properly requested, or that it was prudent for defense counsel to

---

[2] As the district court pointed out, it appears from the overall context that Davidson's counsel intended to request an *involuntary* manslaughter instruction and mistakenly cited the wrong model instruction (namely, the *voluntary* manslaughter instruction), but there is no evidence in the record, beyond inference or assumption from context, that this was actually a mistake by counsel and not his intention. *See Davidson v. Skipper*, No. 20-cv-13188, 2022 WL 4088177, at *7 (E.D. Mich. Sept. 6, 2022) ("Finally, Petitioner is unable to show that . . . the voluntary manslaughter instruction the judge read was not the jury instruction [his counsel] requested.").

request it, given the obvious possibility of the jury's interpreting this as an indication that even

Davidson's defense counsel did not believe Davidson's alibi or claim of innocence.

And three, the prosecutor directly contested any claim of involuntary manslaughter in his

closing argument to the jury, as if the court were going to give that instruction. He argued:

> Edwardian Davidson ran up to [] Frank, punched Frank in the face . . . .
>
> . . .
>
> There's no other cause for the impact. Frank just didn't accidentally fall. It wasn't the [fall] that killed him, it was the punch, it was the knock down. It was the head injury that caused his death. There's no doubt about that.
>
> [Davidson] had one, and only one, or a combination of . . . these three states of mind: He intended to kill, or he intended to do great bodily harm to Frank Bogucki, or he knowingly created a very high risk of death or great bodily harm, knowing that death or such harm would be the likely result of his actions.
>
> When you come up running, up to an 89-year-old man who's not expecting you, and you're 47, and you're six foot two or six foot three, 170 pounds, by your own admission, and you attack an 89-year-old man, what do you think is going to happen? . . . And when you're taking head shots and you choose to hit somebody in the face—he didn't push him. There weren't two hand marks or bruises just on his chest. His face was broken. So you're just not giving someone [a] little jab. He busted him. He put him down. And when you do that to somebody, you have to know there's a great chance of great bodily harm to an elderly man. What else do you think is going to happen?
>
> Now, you don't have to intend to kill him, but he obviously wanted to take him out. Is he eliminating a threat? You know, come on, he's 89. What do you think is going to happen when you take somebody out with that kind of force? Obviously it ended with death.

Among its many instructions to the jury, the court instructed the jury on the elements of

first-degree felony murder and the lesser charge of second-degree murder:

> [T]he defendant is charged with first-degree felony murder. Again, to prove this charge the prosecutor must prove each of the following elements beyond a reasonable doubt –
>
> . . .
>
> First, that the defendant caused the death of Frank Bogucki. That is, that Frank Bogucki died as a result of blunt impact injuries of the head.

6

Second, that the defendant had one of these three states of mind: He intended to kill, or he intended to do great bodily harm to Frank Bogucki, or knowingly created a very high risk of death or great bodily harm, knowing that death or such harm would be the likely result of his actions.

Third, that when he did the act that caused the death of Frank Bogucki, the defendant was committing or attempting to commit the crime of robbery.

. . .

. . . You may also consider the lesser charge of second-degree murder. To prove this charge the prosecutor must prove each of the following elements beyond a reasonable doubt:

First, that the defendant caused the death of Frank Bogucki. That is, that Frank Bogucki died as a result of blunt injuries.

Second, that the defendant had one of these three states of mind: He intended to kill, or he intended to do great bodily harm to Frank Bogucki, or knowingly created a very high risk of death or great bodily harm, knowing that death or such harm would be the likely result of his actions.

Third, that the killing was not justified, excused, or done under circumstances that reduce it to a lesser crime.

If you find the defendant guilty of murder, you must state in your verdict whether it is murder in the first degree or murder in the second degree. As I indicated, I'll show you the verdict form and explain that and how it applies.

The jury deliberated for just under an hour before returning a guilty verdict on all counts, including a specific finding of first-degree felony murder. At sentencing, Davidson continued to protest his innocence, insisting: "But I promise you it wasn't me. I'm an innocent man. I did not commit this crime. I don't understand how the prosecution presented a case without no DNA evidence." The court sentenced Davidson to life without parole.

On direct appeal to the Michigan Court of Appeals, Davidson claimed that his attorney provided constitutionally ineffective assistance of counsel (IAC) by failing to request a jury instruction on involuntary manslaughter. *Michigan v. Davidson,* 2019 WL 137323, at *1 (Mich. Ct. App. Jan. 8, 2019). After reciting the constitutional standard for IAC—i.e., counsel's

performance was deficient and that deficiency prejudiced the defense, *Strickland v. Washington*, 466 U.S. 668, 687 (1984)—the court recited Michigan law about manslaughter jury instructions:

> When a defendant is charged with murder, an instruction for . . . involuntary manslaughter must be given if supported by a rational view of the evidence. In other words, for [a] defendant to be entitled to an involuntary manslaughter instruction, there must be some evidence in the record to support such instruction.

*Davidson*, 2019 WL 137323, at *2 (quotation marks, editorial marks, and citations omitted).

But the court determined that "[t]he record evidence does not support [Davidson]'s claim that he was entitled to an instruction on involuntary manslaughter," because Davidson's defense at trial was an alibi defense (that "he was elsewhere at the time") and he put no evidence in the record to support an alternative involuntary-manslaughter instruction. *Id.* The court also offered three additional reasons for denying Davidson's claim. One, Davidson's absence-of-malice argument was refuted by the state's evidence: "A rational trier of fact could infer from the brutality of [Davidson]'s actions that he intended to cause great bodily harm, or at the very least, acted in wanton and willful disregard that such harm would result from his actions." *Id.* at *3. Two, given the defense theory ("that [Davidson] was not properly identified as the perpetrator of the crime, and he provided several alibi witnesses to support this contention"), Davidson had not "overcome the presumption that defense counsel's decision not to pursue a jury instruction on involuntary manslaughter was sound trial strategy." *Id.* And three, Davidson could not show prejudice "[b]ecause the jury rejected the opportunity to convict [him] of the lesser included offense of second-degree murder, [making] it [] unlikely that it would have chosen to convict him of involuntary manslaughter." *Id.* (citation omitted). The court affirmed the conviction.

The Michigan Supreme Court denied Davidson further appeal and he filed a federal habeas petition pursuant to 28 U.S.C. § 2254, claiming IAC because his attorney failed to request a jury

instruction on involuntary manslaughter. *Davidson v. Skipper*, No. 20-cv-13188, 2022 WL 4088177, at *4 (E.D. Mich. Sept. 6, 2022). The district court began by explaining that federal law does not require an instruction on a lesser-included offense in non-capital cases. *Id.* at *6 (relying on *Parker v. Burt*, 595 F. App'x 595, 605 (6th Cir. 2015)). The court then rejected Davidson's claim by finding: (1) the involuntary-manslaughter instruction was incompatible with his mistaken-identity/alibi defense, *id.*; (2) the decision to pursue "a complete acquittal" might have been a "proper trial strategy," *id.*; and (3) Davidson had not shown prejudice because:

> [Davidson]'s acts of punching an elderly man in the face with such force that he fractured his jaw and orbital bone, causing him to fall to the ground and hit his head, and then possibly kicking the victim or stepping on his leg and shattering his ankle while attempting to move around the car toward the victim's elderly wife, was sufficient evidence of malice to support the felony murder conviction.

*Id.* at *7. The court further found "it unlikely that the jury would have chosen to convict [Davidson] of involuntary manslaughter," given that it had rejected "the lesser included offense of second-degree murder" and instead "opted to convict him of first-degree felony murder." *Id.*

The court denied Davidson's petition but granted a certificate of appealability as to whether his attorney's failure to request an instruction on involuntary manslaughter was IAC.

## II.

Davidson seeks relief from his state-court conviction under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104–132, 110 Stat. 1214, codified at 28 U.S.C. § 2254 *et al*. Under AEDPA, we review the last state court decision that adjudicated the merits, to determine whether that decision "was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(1)-(2).

A state court "unreasonably applies" clearly established law when its ruling is "so lacking in justification that [the] error [is] well understood and comprehended in existing law[,] beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Williams v. Taylor*, 529 U.S. 362, 409 (2000) ("the federal court should ask whether the state court's application of clearly established federal law was objectively unreasonable").

Importantly, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law . . . [and] [t]his distinction creates a substantially higher threshold for obtaining relief than [would] *de novo* review." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quotation marks and citation omitted). In fact, "[i]t is not necessary . . . to decide whether the [state court]'s decision—or, for that matter, the trial judge's [decision]—was right or wrong. . . . [W]hether the trial judge was right or wrong is not the pertinent question under AEDPA." *Id.* at 778 n.3. And the possibility that the federal habeas court might "conclude[] in its independent judgment that the [state court] applied clearly established federal law erroneously or incorrectly" is wholly irrelevant. *See Williams*, 529 U.S. at 411. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102.

Because "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system," *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003), "AEDPA . . . imposes a highly deferential standard [on the federal courts] for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt," *Renico*, 559 U.S. at 773 (quotation marks and citation omitted). Even in the case of a summary denial in which the state court has not fully explained the rationale for its decision, the reviewing "habeas court must determine what arguments or theories could have supported the state court's decision; and then it must ask whether it is possible [that] fairminded jurists could disagree that

10

those arguments or theories are inconsistent with the holding in a prior [Supreme Court] decision." *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011) (quotation marks and editorial marks omitted).

Moreover, "[e]valuating whether a rule application was unreasonable requires considering the rule's specificity." *Harrington*, 562 U.S. at 101 (quotation marks omitted). "The more general the rule at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—the more leeway state courts have in reaching outcomes in case-by-case determinations." *Renico*, 559 U.S. at 776 (editorial and quotation marks omitted). "[I]t is not an unreasonable application of clearly established [f]ederal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Harrington*, 562 U.S. at 101 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (quotation marks omitted)).

"If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102. Indeed, "[s]ection 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id*. at 102-03 (quotation marks and citation omitted).

Davidson's underlying claim is that his trial attorney provided constitutionally ineffective assistance of counsel (IAC) by failing to request a jury instruction on involuntary manslaughter as a lesser-included offense to his charge of first-degree felony murder. To prevail on an IAC claim, a petitioner must show that his counsel's performance was deficient and that it prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance means that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Prejudice means "there is a reasonable probability that, but for counsel's unprofessional errors [i.e., deficient performance], the result of the proceeding would have been different." *Id.* at 694.

A habeas petitioner is entitled to relief on an IAC claim only if the state court's rejection of that claim was "contrary to, or involved an unreasonable application of" *Strickland*, or rested "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Therefore, the combined effect of *Strickland* and § 2254(d) is "doubly deferential" review. *Pinholster*, 563 U.S. at 190 (citation omitted). Put differently, "[t]he question is whether there is any reasonable argument [to support the state court's decision] that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

Recall that the Michigan Court of Appeals denied Davidson's IAC claim by finding, among other reasons, that the record did not support an instruction on involuntary manslaughter, inasmuch as "[a] rational trier of fact could infer from the brutality of [Davidson]'s actions that he intended to cause great bodily harm, or at the very least, acted in wanton and willful disregard that such harm would result from his actions." *Davidson*, 2019 WL 137323, at *3 (citation omitted). Davidson does not address the court's finding that the sheer force and viciousness of the punch—which effectively crushed the entire left side of Frank's face—was sufficient for a reasonable juror to find that Davidson acted with malicious intent, i.e., with the intent to do great bodily harm (or with wanton and willful disregard that such a punch would likely cause great bodily harm). Rather, despite conceding that this was more than an ordinary punch, Davidson stakes his ground on his proclamation that a single punch to the face is not enough to show malice.

Davidson contends that the Michigan court unreasonably applied *Strickland* by framing the question as whether a reasonable juror could have found that he acted with malice, whereas the correct question was whether a reasonable juror could find that he did *not* mean to hurt Frank— i.e., he did not have malicious intent. *See Michigan v. Riley*, 659 N.W.2d 611, 614 (Mich. 2003); Mich. Model CJI 16.4(3). This despite his lying in wait, rushing upon the unsuspecting 89-year-

12

old man, striking him with such force as to break multiple bones in his face and sprawl him out on the floor, and then leaving him there unconscious (and dying) in order to pursue his victim's 84-year-old wife to forcibly rob her of her purse. Davidson insists that a reasonable juror could—in fact, he contends that every juror *would*—find that he did not mean to cause Frank any harm or injury, so this was an accident, mere negligence, culminating in involuntary manslaughter.

Even if this contention were persuasive, it does not mean the Michigan court unreasonably applied *Strickland*. *See Renico*, 559 U.S. at 778 n.3 (explaining that "whether the [state court]'s decision—or, for that matter, the trial judge's [decision]—was right or wrong . . . is not the pertinent question under AEDPA"). The relevant question is whether the determination that an involuntary manslaughter instruction was unsupported by the record was "beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Davidson fails to meet this standard.

Applying *Strickland* to these facts, the Michigan court reasonably determined that counsel's failure to pursue the involuntary-manslaughter instruction was not deficient performance because the evidence did not support that instruction—defense counsel had introduced no evidence that would support that instruction, whereas the prosecution's evidence (i.e., the force and destructiveness of the punch) refuted the instruction. Moreover, as the district court found, counsel might well have made a strategic choice to abandon the request for a manslaughter instruction. *See Davidson*, 2022 WL 4088177, at *6. Recall that defense counsel did not raise this issue proactively; the prosecution asked about it unexpectedly during a recess, defense counsel answered off the cuff, and the court considered it then and there. It is possible that, despite initially answering that he wanted a manslaughter instruction, counsel might have had second thoughts—realizing that a manslaughter instruction necessarily contradicted and undermined the mistaken-identity/alibi defense that he had spent the prior two days of trial constructing. This could explain

13

counsel's disinterest in pursuing it. Because Davidson did not produce any post-conviction testimony from counsel, we cannot know.

Alternatively, even if counsel had rendered deficient performance in failing to pursue the instruction, Davidson did not show prejudice—he did not demonstrate a reasonable probability that the trial court would have agreed to the instruction, or that the jury would have agreed to convict him of involuntary manslaughter in lieu of murder. Recall that the trial court questioned the request, demanding to see the model jury instruction so that it could consider its text and decide. While the trial court refused to give the *voluntary* manslaughter instruction because there was no evidence of passion or emotional excitement, it is equally possible—even likely—that the court would have refused to give the *involuntary* manslaughter instruction because there was no evidence that Frank's severe injuries (and death) were unintended or due to mere negligence. And recall that the jury deliberated for less than an hour before returning the first-degree murder conviction, thereby rejecting the lesser-included second-degree-murder option. Even if the trial court had given the involuntary-manslaughter instruction, it is all but certain that the jury would have rejected it and convicted Davidson of first-degree felony murder.

Under our "doubly deferential" review of an IAC claim in an AEDPA proceeding, *see Pinholster*, 563 U.S. at 190, "[t]he question is whether there is any reasonable argument [to support the state court's decision] that counsel satisfied *Strickland*'s deferential standard," *Harrington*, 562 U.S. at 105. Because any one of several reasonable arguments support the Michigan Court of Appeals' decision to deny Davidson's IAC claims, his AEDPA claim must fail.

## III.

For the forgoing reasons, we AFFIRM the judgment of the district court.